In re Dennis G. ELLIS Sr., Debtor.

Daniel R. GREENE, Plaintiff,

v.

Dennis G. ELLIS Sr., Defendant.

Daniel R. GREENE, Plaintiff,

v.

Dennis G. ELLIS; Denelda K. Ellis; National First Lenders Corp.; Angela R. Stickley, Trustee; Arnold M. Weiss, Substitute Trustee; First Union Mortgage Corp.; Federal Home Loan Mortgage Corporation; and N. David Roberts, Trustee, Defendants.

Bankruptcy No. 91–33447.
Adv. Nos. 92–3024, 92–3038.

United States Bankruptcy Court,
E.D. Tennessee.

Feb. 2, 1993.

Steven D. Lipsey, Knoxville, TN, for Daniel R. Greene.

Denna F. Middleton, Knoxville, TN, for Dennis and Denelda Ellis.

C. Dan Scott, Sevierville, TN, for National First Lenders Corp., Angela R. Stickley, Trustee, Arnold W. Weiss, Substitute Trustee, First Union Mortg. Corp., and Federal Loan Mortg. Corp.

N. David Roberts, Knoxville, TN, Trustee.

### MEMORANDUM

JOHN C. COOK, Bankruptcy Judge.

These two lawsuits have been consolidated for trial. There are two main issues to be decided. First, the plaintiff, Daniel R. Greene ("Greene"), contends that the debtor-defendant, Dennis G. Ellis Sr. ("Ellis"), still owes him the balance due on a piece of real estate the plaintiff sold Ellis and that such obligation should be declared nondischargeable pursuant to §§ 523(a)(2)(A) and 523(a)(6) of the Bankruptcy Code. Second, Greene contends he possesses a vendor's lien on the property sold to Ellis and that such vendor's lien takes priority over a deed of trust presently held by the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The remaining defendants are the subject of the plaintiff's action to determine the priority of the alleged vendor's lien. The following constitutes the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### I.

Plaintiff Greene owned a house located in Sevier County, Tennessee, that he was attempting to sell. The debtor, Ellis, contacted Greene to inquire about the proper-

ty. On September 23, 1988, Greene and Ellis executed a lease-purchase agreement wherein Ellis agreed to lease the house for one year at $1000 per month and retained an option to buy the house for $120,000 and assume a $85,000 mortgage, if assumable, held by Home Federal Savings & Loan Association ("Home Federal").

Ellis paid Greene the first $1000 lease payment for October 1988 when they entered into the lease-purchase agreement. Lease payments for the next eight months, through June 1989, were also paid in a timely manner.

Eventually, Ellis decided to buy the property. He told Greene that in order to procure a loan to buy the property he needed a deed naming him and his wife owners of the property. Greene agreed to give Ellis a deed conveying the property to Ellis but only on the condition that the deed reflect as liens the $81,000 mortgage balance owed to Home Federal and the $39,000 owed Greene for sale of the property to Ellis.

On June 21, 1989, Greene executed and delivered the warranty deed to Ellis. The deed contained a provision noting the mortgage balance owed to Home Federal and the $39,000 balance of the purchase price owed to Greene as follows:

[A]nd that said premises are free from all incumbrances except

ho HOME FEDERAL S.B. LOAN 3
568-05
SEVIERVILLE, TN. 37862 81,000
BALANCE
DANIEL R. GREENE
39,000 BACK

Ellis retained the original copy of the deed which he agreed not to record until financing had been completed.

In conjunction with the conveyance of the property, Ellis and Greene executed an agreement which provides in relevant part:

I Dennis Ellis promise to pay to Daniel R. Greene 120,000 for home as described below

. . . . .

PAID IN FULL BY OCTOBER 1989

In regards to the warranty deed issued for the purchase of home, this agreement is to supersede the warranty deed prepared 21 day of June, 1989, between Daniel R. Greene of Knox County and Dennis G. Ellis and wife of Knox County. This agreement deals with property situated in the 8th Civil District of Sevier County, Tennessee and being all of Lot 9 of Section 2 of Grandview Estates. If adequate funding cannot be obtained then this agreement supersedes warranty deed and reverts back to and including the original agreement signed on or about October, 1988, between Daniel Greene and Dennis G. Ellis.

On June 27, 1989, Ellis recorded an altered version of the warranty deed in the office of the Register of Deeds for Sevier County. The altered deed contained the provision noting the outstanding mortgage balance owed to Home Federal, but the notation that provided for Greene's vendor's lien had been deleted by Ellis. In recording this altered deed, Ellis signed a sworn statement falsely stating that he had already paid Greene $54,000 for the conveyance of the property.

Ellis continued to make lease payments to Greene through September 1989. However, the bank returned Ellis's check for the September lease payment due to insufficient funds.

In January 1990, Ellis and his wife applied to National First Lenders Corporation ("NFL") for a loan to refinance the property. In making this application, Ellis misrepresented for a second time that he had already paid Greene $54,000 for the conveyance of the property.

At the request of Ellis, Greene agreed to come to NFL's office on January 19, 1990, to sign a letter in an attempt to help Ellis acquire the financing. During his meeting at NFL, Greene asked Ellis in the presence of Jim Baker, NFL's president, and Michelle Cutshaw, an NFL employee, "when will I get my money?" Baker told Greene that he would receive his money when the loan was finalized at the closing.

NFL does not fund the loans it originates, but rather serves as a mortgage broker by selling loans to investors in the

primary mortgage market. The loan application is the first step in preparing a loan for sale to investors. Eventually, a final package, which included the typed final application, a credit report, verification of the borrower's employment, an appraisal of the property to be financed, and verification of the amount of the borrower's deposit account and other assets, was sent to First Union Mortgage Corporation ("FUMC"). After reviewing this final package, FUMC asked NFL to provide canceled checks representing the last twelve months' mortgage/rent payments. Those checks established that Ellis had continued to make lease payments to Greene after Greene had conveyed the property to Ellis by deed. The file also included multiple sale prices for the house and evidence that James L. Jones, not Daniel R. Greene, had conveyed the property to Ellis, as well as a discrepancy in the verification of Ellis's deposit accounts. Nevertheless, on January 25, 1990, FUMC agreed to fund the loan.

As a participant in the primary mortgage market, FUMC initially funds mortgage loans with the intent of immediately selling the loans on the secondary market and retaining the right to service the loans for a fee. FUMC's primary source of income from these loans is the service fees. Freddie Mac purchases loans from FUMC and numerous other lenders in the secondary market. The guidelines which must be met before Freddie Mac purchases a particular loan are set forth in its Sellers' & Servicers' Guide ("Guide"). That publication characterizes entities such as FUMC as independent contractors.

In February 1990, Freddie Mac and FUMC by letter agreement entered into a "Master Commitment" wherein FUMC committed to sell $1 billion worth of qualifying loans to Freddie Mac in exchange for Freddie Mac Mortgage Participation Certificates. The letter agreement incorporated by reference the guidelines for qualifying loans set forth in the Guide. Moreover, the agreement provided that many loans were transferred without recourse and also that FUMC was to receive servicing fees for the loans FUMC serviced for Freddie Mac.

On February 16, 1990, Ellis and his wife executed a promissory note in favor of NFL and NFL made the loan to Ellis in the amount of $118,125. The loan was secured by a deed of trust on the subject property. FUMC provided funding for the loan. The deed of trust was recorded in the office of the Register for Sevier County on February 27, 1990.

On February 22, 1990, NFL's president, James Baker, negotiated the note to FUMC by special endorsement and assigned the deed of trust to FUMC. On March 2, 1990, FUMC sold the note by computer transmission, which it endorsed in blank, to Freddie Mac. Because the computer transmission reflected the loan met all of Freddie Mac's requirements, it was accepted without review. FUMC also assigned the deed of trust to Freddie Mac on March 2, 1990. Freddie Mac paid FUMC for the note and deed of trust in April 1990. By contractual agreement, First Union National Bank served as Freddie Mac's custodian and held the note on Freddie Mac's behalf.

Greene filed a notice of lien *lis pendens* on May 21, 1990, that was recorded in the office of the Register of Deeds for Sevier County.

In the dischargeability action, Greene contends that Ellis willfully and maliciously injured Greene's property when he deleted Greene's vendor's lien from the deed. Greene also contends that Ellis' conduct in deleting the lien constituted fraud. Accordingly, Greene seeks an order declaring the balance of the purchase price owed by Ellis to Greene for the sale of the property to be nondischargeable under the provisions of § 523(a)(6) and § 523(a)(2)(A) of the Bankruptcy Code.

In the priority action, Greene contends that under Tennessee law, FUMC and Freddie Mac stand in the shoes of NFL and are therefore subject to any claims or defenses that could have been asserted against NFL. Greene also contends that NFL and FUMC are agents of Freddie Mac and thus Freddie Mac should be imputed with notice of Greene's vendor's lien. Accordingly, Greene seeks an order declaring

that his vendor's lien be given priority over the deed of trust held by Freddie Mac.

Freddie Mac contends (1) that the language allegedly used by Greene on the deed to establish his lien is legally insufficient under Tennessee law to establish a vendor's lien; (2) that neither NFL nor FUMC is its agent; (3) that it is a bona fide purchaser and a holder in due course of the promissory note and therefore is not subject to any defenses or claims that could be asserted against NFL or FUMC; and (5) that based on the Tennessee recording statutes its deed of trust has priority over Greene's vendor's lien.

## II.

■ The first question to be decided is whether Greene's claim against Ellis for the balance of the purchase price on the property should be declared nondischargeable.

The evidence established that Ellis still owes Greene $39,000 for the conveyance of the property. The evidence also established that amount was noted as a lien or encumbrance on the deed given by Greene to Ellis and that Ellis subsequently deleted Greene's lien before recording the deed.

Section 523(a)(6) reads in pertinent part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C.A. § 523(a)(6) (West 1979).

■ A wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury. *Perkins v. Scharffe*, 817 F.2d 392 (6th Cir. 1987). Injuries within the meaning of § 523(a)(6) are not confined to physical damage or destruction but also include an injury to intangible personal or property rights. 3 COLLIER ON BANKRUPTCY ¶ 523.16 (15th ed. 1992).

By deliberately deleting Greene's vendor's lien from the deed before recording it,

Ellis committed a wrongful act without just cause or excuse. Thereafter, Ellis pledged the deed to obtain a loan through NFL. No doubt, he thought that if the property reflected a lien in favor of Greene, the loan would not be made. The deletion of Greene's vendor lien from the deed, coupled with the wrongful act of pledging the altered deed to secure his loan at NFL, necessarily led to the injury suffered by Greene in this case, namely the loss of the value of his lien. Because, for the reasons stated below, Greene's vendor's lien does not take priority over the lien of Freddie Mac, Greene has been damaged by Ellis' wrongful act in the amount of $39,000, the value of the lien. That amount will be declared nondischargeable pursuant to § 523(a)(6).

■ Greene also relies upon §§ 523(a)(2)(A) in seeking an order declaring his claim against Ellis nondischargeable. Section 523(a)(2)(A) provides in relevant part:

**§ 523. Exceptions to discharge.**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) ... actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C.A. § 523(a)(2)(A) (West & Supp. 1992).

"Actual fraud" is defined as any "... deceit, artifice, trick, design, some direct and active operation of the mind; it includes cases of the intentional and successful employment of any cunning, deception, or artifice used to circumvent or cheat another. It is something said, done, or omitted by a person with the design of perpetrating what he knows to be a cheat or deception." Black's Law Dictionary 595 (5th ed. 1979); *Sears Roebuck & Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 750 (Bankr.N.D.Ind.1986).

Ellis' wrongful conduct in this case constituted actual fraud. The object of his fraudulent scheme was to deprive Greene of his lien against the property. First, Ellis persuaded Greene to convey the property to him by agreeing to the notation of Greene's lien on the deed. Next, without Greene's knowledge or consent, Ellis deleted the lien from the deed and recorded it. Then, Ellis pledged the altered deed to obtain the loan through NFL. As a result of this fraudulent conduct, Greene is entitled to a order declaring the $39,000 obligation nondischargeable under the provisions of § 523(a)(2)(A).

### III.

The second question to be decided is which of two liens, Greene's vendor's lien or Freddie Mac's deed of trust, is entitled to priority.

■ Freddie Mac initially argues that the language used in the original deed, namely, "DANIEL R. GREENE 39,000 BACK," was legally insufficient to create a vendor's lien. The court disagrees. That language was typed in the space immediately under the printed language of the deed that stated "that said premises are free from all incumbrances except...." Also, contained in the same space was a notation of the balance owed to Home Federal, an obvious reference to Home Federal's mortgage. A vendor's lien may be created by any words which distinctly convey the idea that the vendor retains a lien on the land as security for the performance of a contract. 77 Am.Jur.2d *Vendor and Purchaser* § 466 (1975). Although the language used to create Greene's vendor's lien could have been better, the court believes anyone examining the deed would have concluded it noted an encumbrance on the property. Hence, the language was sufficient to create the vendor's lien.

■ Freddie Mac relies on Tennessee Code Annotated §§ 66–24–101(a)(4) and 66–26–103 for the proposition that, as a bona fide purchaser, its deed of trust must be given priority under Tennessee's statutory recording system. Those two sections provide as follows:

**66–24–101. Writings eligible for registration.**—(a) The following writings may be registered:

. . . .

(4) All deeds for absolute conveyance of any lands, tenements or hereditaments, or any estate therein....

**66–26–103. Unregistered instruments void as to creditors and bona fide purchasers.**—Any of said instruments not so proved, or acknowledged and registered, or noted for registration, shall be null and void as to existing or subsequent creditors of, or bona fide purchasers from, the makers without notice.

TENN.CODE ANN. §§ 66–24–101(a)(4) and 66–26–103 (1982).

The deed of trust was assigned to FUMC on February 22, 1990. It was recorded on February 27, 1990. On March 2, 1990, FUMC sold the note and deed of trust to Freddie Mac by endorsing the note in blank and assigning the deed of trust to Freddie Mac.

■ The lien of a deed of trust passes to the endorsee of a note, without special assignment, since the mortgage is incident to the debt. *W.C. Early Co. v. Williams*, 135 Tenn. 249, 254, 186 S.W. 102, 103 (1916). Moreover, it is not necessary to record the assignment to preserve priorities over subsequent encumbrances. *Id.* Therefore, because Freddie Mac took the note by endorsement and the deed of trust by assignment, its priority rights became effective on February 27, 1990, when the deed of trust was first recorded.

■ Greene's vendor's lien was not recorded, as it could have been pursuant to § 66–24–101(a)(4), and had to have been in order to establish Greene's position as a secured creditor and thereby his priority pursuant to § 66–26–103. A bona fide purchaser takes property subject only to interests of which he has notice. Because Freddie Mac's priority rights were effective as of February 27, 1990, and Greene did not file the lien *lis pendens* until May 21, 1990, Freddie Mac's deed of trust must be given priority pursuant to § 66–26–103 if Freddie Mac qualifies as a bona fide purchaser.

A bona fide purchaser is a purchaser for value without knowledge or notice of material facts to the title. *Toxey H. Sewell, The Tennessee Recording Sys.*, 50 Tenn.L.Rev. 1, 42 (1982) (*citing Henderson v. Lawrence,* 212 Tenn. 247, 255, 369 S.W.2d 553, 557 (1963)). Greene does not dispute the fact that Freddie Mac purchased the deed of trust. However, based on the numerous problems apparent in the "final package" sent to FUMC by NFL, Greene contends that FUMC had actual notice of his lien or, at least, FUMC was on inquiry notice, and, because the relationship of agent and principal existed between NFL and FUMC, and between FUMC and Freddie Mac, respectively, Freddie Mac should be imputed with notice. Notice to FUMC cannot be imputed to Freddie Mac unless FUMC is its agent. Consequently, the court must determine whether an agency relationship existed between FUMC and Freddie Mac.

"An agent is a person authorized by another to act for him, one entrusted with another's business." 1 Tenn.Juris. *Agency* § 1 (1982). When a contract exists between the parties, the contractual language used by the parties is not necessarily controlling in determining whether an agency relationship exists. *Franklin Distrib. Co. v. Crush Int'l,* 726 S.W.2d 926, 930 (Tenn.App.1986). An agency relationship can be established by the conduct of the parties involved and other relevant external circumstances. *Electric Power Board of Nashville v. Woods,* 558 S.W.2d 821, 824 (Tenn.1977). The primary criterion by which the determination must be made is whether the party, who is purportedly the principal, authorized the agent to act for the principal's benefit and at the same time retains the right to control the agent's conduct. *Franklin Distrib.,* 726 S.W.2d at 930. In determining whether an agency relationship existed, all the facts and circumstances presented by the case must be considered. *Id.*

Greene's first argument is that the contractual language in the Guide characterizing FUMC as an independent contractor is not controlling under Tennessee law. Although not controlling, it is one factor the court may consider in determining whether an agency relationship existed. *Cf. Mendrala v. Crown Mortgage Corp.,* 955 F.2d 1132, 1141 (7th Cir.1992) (finding, partially on the basis of its characterization in Freddie Mac's Guide, that an entity who sold mortgages to and serviced those mortgages for Freddie Mac was an independent contractor).

While the Guide characterizes FUMC as an independent contractor, Greene argues this characterization should be rejected because Freddie Mac controlled FUMC in the manner FUMC made loans and thus FUMC should be considered its agent. To support this contention, Greene argues (1) FUMC and Freddie Mac entered into a Master Commitment in February 1990 whereby Freddie Mac agreed to purchase $1 billion of qualifying loans in a one-year period from FUMC; (2) the loan standards set forth in Freddie Mac's Guide are very detailed; (3) Freddie Mac purchases all loans which meet its detailed qualifications set forth in the Guide; (4) the purchase occurs when the qualifying loans are submitted by computer transmission from FUMC to Freddie Mac; and (5) that Freddie Mac benefitted from the relationship.

Greene's argument must be rejected. The Master Commitment and the Guide are merely tools utilized by Freddie Mac to facilitate the purchasing of a large number of loans from numerous entities consistent with its statutory purpose which is:

(1) to provide stability in the secondary market for home mortgages;

(2) to respond appropriately to the private capital market; and

(3) to provide ongoing assistance to the secondary market for home mortgages (including mortgages securing housing for low and moderate-income families involving a reasonable economic return to the Corporation) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for home mortgage financing.

Pub.L. No. 91–351, § 301, as amended, Pub.L. No. 101–73, Title VII, § 731(a), 103

Stat. 429 (Aug. 9, 1989). The fact that Freddie Mac bought all qualifying loans submitted to it by FUMC by computer transmission pursuant to the Master Commitment does not establish that Freddie Mac controlled FUMC; it merely indicates that Freddie Mac is a very large business whose viability depends upon the acceptance of a large volume of qualifying loans in an expedient manner. The Guide simply sets forth the standards for entities such as FUMC to follow in qualifying loans to sell to Freddie Mac pursuant to contract. A requirement that work be performed according to standards and specifications imposed by an employer under a contract is not sufficient to establish the degree of control necessary to make a presumably independent contractor the agent of the employer. *See* 41 Am.Jur.2D *Independent Contractors* § 8 (1968). Indeed, if the court were to find that the Master Commitment and Guide created an agency relationship between FUMC and Freddie Mac, the import of such a decision would be that all entities that sell mortgages to Freddie Mac under similar circumstances would be agents of Freddie Mac, a result with far-reaching implications. The court simply does not believe that the law or facts of this case lead to such a finding.

Greene also argues that Freddie Mac authorized FUMC to act for Freddie Mac's benefit. Once again, Greene apparently is contending that because Freddie Mac contracted to buy $1 billion worth of qualifying loans an agency relationship was established. Freddie Mac did not authorize FUMC to act on its behalf; it merely entered into a contractual relationship with FUMC wherein FUMC committed to sell $1 billion worth of qualifying loans to Freddie Mac in exchange for payment and the right to be paid service fees for loans serviced. In *Foster Trailer Co. v. United Fidelity & Guar. Co.*, 190 Tenn. 181, 186, 228 S.W.2d 107, 109 (1950), the court stated that an essential element of an agency relationship is that the object of the contract is for the benefit of the principal. Obviously, in commercial contracts, both parties expect to and generally do reap some benefit from their contracts. The court believes that the object of Freddie Mac and FUMC's contractual dealings was to benefit both of them.

After considering all the facts and circumstances, the court believes the evidence establishes Freddie Mac and FUMC intended that an independent contractor relationship be established and that their actual dealings were as parties to a contract, and not as principal and agent. Therefore, Freddie Mac will not be imputed with notice of Greene's vendor's lien.

Next, Greene relies on *TRW–Title Ins. Co. v. Stewart Title Guaranty Co.*, 832 S.W.2d 344 (Tenn.App.1991), for the proposition that all defenses which could be asserted against FUMC, a mortgage-lending institution, are available against Freddie Mac, an assignee of a promissory note secured by a deed of trust. In *TRW–Title*, the Tennessee Court of Appeals held that when a title insurer becomes the assignee of an obligation secured by a deed of trust, because it is required to compensate its insured for a loss covered by the title insurance policy issued, it takes subject to any defenses which could have been asserted against its insured. *TRW–Title* does not involve competing lien priorities and, therefore, is inapposite.

Finally, Greene relies on *Osborne, et al, Real Estate Finance Law* § 5.32, at 338–41 (1979), for the proposition that because Freddie Mac is not a holder in due course of the note, Freddie Mac is subject to "latent equities"; that is, Greene can assert his interests against Freddie Mac, because they are directly related to the malfeasance of Ellis, the maker of the note. The court must determine whether Freddie Mac is a holder in due course.

Holder in due course is defined under § 47–3–302 as follows:

**47–3–302. Holder in due course.**—(1) A holder in due course is a holder who takes the instrument:

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense

against or claim to it on the part of any person.

Tenn.Code Ann. § 47–3–302(1) (1992).

Under this definition, Freddie Mac must meet several criteria to qualify as a holder in due course. First, Freddie Mac must be a holder. A holder means a person who is in possession of an "instrument" issued or endorsed to him or to his order or to bearer or in blank. Tenn.Code Ann. § 47–1–201(20) (1992). The court has already determined that the note was endorsed to Freddie Mac in blank and, further, that by contractual agreement, First Union National Bank served as Freddie Mac's custodian and held the check on Freddie Mac's behalf.

Second, the instrument must meet the criteria set forth in Tennessee Code Annotated § 47–3–104 to be properly negotiated. There is no dispute as to the negotiability of the instrument.

Next, the note must be taken for value without notice of any defense against or any claim to it on the part of any person. The evidence clearly established Freddie Mac took the note for value without notice of any defense or claim.

Finally, the note must be taken in good faith. Good faith is defined as "honesty in fact in the conduct or transaction concerned." Tenn.Code Ann. § 47–1–201(19) (1992). Freddie Mac took the note in the ordinary course of its daily business along with numerous other qualifying loans accepted by computer transmission. Nothing in the record suggests anything other than Freddie Mac took the note in good faith.

Therefore, because Freddie Mac meets the enumerated criteria, it is a holder in due course and is not subject to Greene's claim.

An order will enter declaring Ellis' obligation to Greene nondischargeable under §§ 523(a)(6) and 523(a)(2)(A) of the Bankruptcy Code and declaring that Freddie Mac's deed of trust takes priority over Greene's vendor's lien.