**In re Stanley G. HARRIS, Bankrupt.**

**Toshio INAHARA, Robert L. Kalez, Longview Booming Co., Roland Brusco, Albert Starr, James A. Wood and Golden Key Associates, a partnership, Plaintiffs,**

**v.**

**Stanley G. HARRIS, Defendant.**

**No. B75–416.**

United States District Court, D. Oregon.

June 30, 1976.

Herbert H. Anderson, Dezendorf, Spears, Lubersky & Campbell, Portland, Or., for plaintiffs.

Kevin P. O'Connell, Dennis H. Elliott, O'Connell, Goyak & Haugh, Portland, Or., for defendant-bankrupt.

## OPINION

SOLOMON, District Judge:

The plaintiffs appeal from a ruling by the Bankruptcy Judge that the plaintiffs' judgment debt against Stanley Harris, the de-

fendant-bankrupt, for breach of a fiduciary duty was dischargeable in bankruptcy.

Before his adjudication as a bankrupt, Harris was engaged in many businesses. One of them, International Realty, Ltd. (International), specialized in tax-sheltered investments for high-income taxpayers. Harris was the president and sole stockholder of International.

International organized partnerships to buy real property, primarily apartment and office buildings, to incur paper losses through accelerated depreciation and prepaid interest charges. As a sales tactic, Harris himself frequently invested in those partnerships to show potential investors that he had confidence in the investment. The money that Harris invested generally came from part of the high brokerage fees that he charged on these transactions.

In 1968, Dave Christensen, Inc. (Christensen) offered to sell the Golden Key Apartments (the apartments) for a net price of $907,500—$207,500 in cash and the assumption of a $700,000 mortgage.

Harris organized the Golden Key Associates, a partnership, to buy the apartments. Harris was the managing partner.[1] The other partners are the plaintiffs in this action; most of them are physicians. In December 1968, Harris signed a land sale contract for the partnership to purchase the apartments for $1,010,000. The contract provided that the partnership would make a $260,000 down payment as prepaid interest.

In a separate agreement, which Harris concealed from the plaintiffs, Christensen agreed that International was to receive a broker's commission of $100,000 and an escrow fee of $2,500 out of the $1,010,000 sales price. This left Christensen with a net of $907,500 for the apartments.[2] Christensen also agreed to convey to International the vendor's interest in the Golden Key land sale contract.

Harris then collected $260,000 from his partners. He paid $207,500 to Christensen; this cash payment and the assumption of the $700,000 mortgage paid Christensen in full for the apartments. Harris paid the other $52,500 to International.[3]

Harris concealed from his partners, the plaintiffs here, the fact that his company, International, was getting $102,500 out of the deal and that International was also acquiring Christensen's interest in the land sale contract.

In 1970, when the partnership fell behind in its monthly contract payments, Harris threatened to foreclose the partnership interest in the apartments. The plaintiffs then learned for the first time that International owned the vendor's interest in the contract and that International had received $102,500 on the sale. The plaintiffs filed a state court action to require Harris to account to the partnership for the $102,500 in commissions and to hold the title to the property in trust for them. They prevailed on both grounds.

The Oregon Supreme Court affirmed on the ground that Harris had violated his fiduciary duty to his partners under ORS 68.340(1):[4]

> When, as in this case, a real estate broker undertakes to join as a member of a partnership or joint venture in the purchase of real property on which he holds a listing, he is also subject to the fiduciary duties of undivided loyalty and complete disclosure owed by one partner to anoth-

---

1. International was hired to manage the apartments for five per cent of the gross rentals.

2. Harris designed the documentation of the transaction to conceal the benefits he received. Christensen was not concerned with how Harris handled the documentation as long as it got $907,500 from the sale.

3. The balance of International's commission was to be paid out of overrides on the monthly mortgage payments.

4. "Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property."

er. Indeed, one of the fundamental duties of any partner who deals on his own account in matters within the scope of his fiduciary relationship is the affirmative duty to make a full disclosure to his partners not only of the fact that he is dealing on his own account, but all of the facts which are material to the transaction. . . .

. . . . .

In this case, Harris did not inform plaintiffs or disclose to them the fact that this property could have been purchased for $907,500 "net" to the seller or that upon its purchase for $1,010,000 Harris or International (of which Harris was the president) would be paid a commission in the amount of $100,000. In the absence of such a disclosure there could be no effective "consent" by plaintiffs to the payment or retention by Harris of any such "benefit" from that transaction, for the purposes of ORS 68.340(1). *Starr v. International Realty*, 271 Or. 396, 403, 533 P.2d 165, 168 (1975).

Harris did not pay the judgment. In February 1975, he filed a voluntary petition in bankruptcy in which he listed debts of more than $4,800,000, including about $1,500,000 in unsecured obligations. He also listed his total assets at $1,231,000—his estimate of the value of certain personal property, most of which consisted of art objects. The $4,800,000 debt figure did not include unpaid federal and state income taxes, even though Harris acknowledges that he has not filed income tax returns

since 1969. Later, when an eight-count indictment was filed against him in federal court, Harris pleaded guilty to one count of "wilfully and knowingly" filing a "false and fraudulent income tax return."

In February 1975, the plaintiffs filed this action in the Bankruptcy Court to declare that their judgment against Harris was not discharged by his bankruptcy.[5]

The complaint here alleged that the debt was nondischargeable under Section 17(a) of the Bankruptcy Act because it was "created by the bankrupt's fraud and by fraud, misappropriation or defalcation while acting in a fiduciary capacity."

The plaintiffs submitted the case on the transcript of the state court proceedings and the judgment of the state court. They offered no live testimony. Harris did not offer any evidence.

Later, the plaintiffs moved to amend their complaint to specify the provisions of Section 17(a) on which they relied. The Bankruptcy Judge allowed the plaintiffs to specifically allege Sections 17(a)(2) and (4), but denied their request on Section 17(a)(8).[6]

The Bankruptcy Judge found that the plaintiffs failed to prove fraud under Section 17(a)(2), and he held that Section 17(a)(4) was inapplicable because Harris was not acting in a fiduciary capacity when the debt was created. The plaintiffs' motion for rehearing was denied, and they appealed from the decision. I reverse.

---

5. Several other creditors filed complaints to exempt from discharge Harris's debts to them.

American Express Co. contended that Harris's $10,449 debt to it was for money obtained "under false pretenses and false representations in that [Harris] prepared and submitted to [American Express] fictitious charge slips with the intent to obtain money under false pretenses." The parties settled that action by stipulating that $7,000 of the debt was nondischargeable.

Eight other creditors contended that Harris owed them more than $120,000, plus interest, because he induced them through fraud to buy certain real estate from him. The parties settled the action by stipulating that $127,000 was nondischargeable.

6. Section 17(a) provides:

"A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . (2) are liabilities for obtaining money or property by false pretenses or false representations . . . or for willful and malicious conversion of the property of another; . . . (4) were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity; . . . or (8) are liabilities for willful and malicious injuries to the person or property of another other than conversion as excepted under clause (2) of this subdivision."

## I. *Section 17(a)(2)*

■ The plaintiffs contend that Harris's debt to them is nondischargeable under Section 17(a)(2) of the Bankruptcy Act, 11 U.S.C. § 35(a)(2), because Harris obtained the money by "false pretenses or false representations" and by "willful and malicious conversion".

To prevail, the plaintiffs must prove fraud. The fraud must be "positive fraud or fraud in fact, involving moral turpitude or intentional wrong; not implied fraud which may exist without bad faith." *Forsyth v. Vehmeyer*, 177 U.S. 177, 182, 20 S.Ct. 623, 625, 44 L.Ed. 723 (1899); *Wright v. Lubinko*, 515 F.2d 260, 263 (9th Cir. 1975). This requirement of positive fraud is "consonant with equity and consistent with the object and intention of Congress in enacting a general law by which the *honest* citizen may be relieved from the burden of hopeless insolvency." (emphasis added) *Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 586 (1877).

■ Fraud may consist of concealment or intentional nondisclosure, as well as affirmative misrepresentation, of material facts, *Musgrave et al. v. Lucas et al.*, 193 Or. 401, 410, 238 P.2d 780, 784 (1951), particularly when the parties stand in a confidential or fiduciary relation to one another. *Starkweather v. Shaffer*, 262 Or. 198, 497 P.2d 358, 362 (1972).

The state court in *Starr v. International Realty, supra*, did not make findings on fraud because that action was based on breach of a fiduciary duty, not fraud. The court found that Harris had breached his fiduciary duty to his partners by not disclosing the $102,500 commission and escrow fee and by obtaining the vendor's interest in the land sale contract without the partners' consent.

Although the state court did not make findings on fraud, the plaintiffs relied on the state court record to prove their fraud charge here; they introduced no other evidence.

On the basis of the state court record, the Bankruptcy Judge found that the plaintiffs did not prove fraud because they failed to prove one element, namely reliance.

■ I recognize that the party seeking nondischarge of a bankruptcy debt has the burden of proof. *U. S. Fidelity and Guaranty Co. v. Tanner*, 279 F.Supp. 396, 400 (D.Colo.1968). I also recognize that a Bankruptcy Judge's findings are entitled to great weight and should be overruled only when they are clearly erroneous. In my view, however, considering the totality of the evidence, the Bankruptcy Judge clearly erred when he found that the plaintiffs, to whom Harris owed a fiduciary duty, did not rely on Harris's concealment of his $102,500 fee and his receipt of the vendor's interest in the contract. Although it would have been preferable for the plaintiffs here to supplement the state court record with additional evidence on fraud, particularly reliance, a careful examination of the existing record requires the conclusion that Harris willfully and intentionally concealed material facts from his partners and that, if they had known the concealed facts, they would not have agreed to the terms of the contract, and I so hold.

■ In any event, I do not believe it was necessary for the plaintiffs to prove actual reliance here because this is a case of concealment, not affirmative misrepresentation. It is only necessary to determine whether a reasonable man would attach importance to the concealed information in determining his course of action. An excellent statement of this principle is set forth in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), a securities case. There, the Supreme Court said that in a nondisclosure case

> . . . positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. . . . This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

This rule was applied by the Second Circuit in *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (1975):

> . . . Unlike instances of affirmative misrepresentation where it can be demonstrated that the injured party relied upon affirmative statements, in instances of total non-disclosure, as in *Affiliated Ute*, it is of course impossible to demonstrate reliance, and resort must perforce be had to materiality, i. e., whether a reasonable man would attach importance to the alleged omissions in determining his course of action.

Under this reasonable man test, I do not think there is any question that the plaintiffs would have attached importance to Harris's $102,500 commission and escrow fee and to Harris's acquisition of the vendor's interest in their contract; these facts were certainly material. If the plaintiffs had known these facts, it is unlikely they would have permitted Harris to take such a large commission or to acquire the underlying title to their property.

## II. *Section 17(a)(4)*

In the alternative, the plaintiffs contend that Harris's debt to them is nondischargeable under Section 17(a)(4) of the Bankruptcy Act, 11 U.S.C. § 35(a)(4), because it was created by Harris's "fraud, embezzlement, misappropriation or defalcation while acting . . . in any fiduciary capacity."

The Bankruptcy Judge held for Harris on the ground that when this debt was created Harris was not acting in a "fiduciary capacity", as that term is used in Section 17(a)(4). I disagree.

The courts have attempted to avoid making Section 17(a)(4) so broad that it reaches such ordinary commercial relationships as creditor-debtor and principal-agent.[7]

The purpose of the Bankruptcy Act, as stated in *Hamby v. St. Paul Mercury Indemnity Co.*, 217 F.2d 78, 81 (4 Cir. 1954), "is to grant a discharge of honest debts to honest debtors, not to grant discharges to those who have dishonestly misappropriated funds entrusted to them."

I hold that Harris, while acting in a fiduciary capacity, deliberately concealed the fact that he had collected for himself $102,500 in violation of his obligation to his partners and that he also concealed the fact that he had acquired the vendor's interest in the contract in derogation of the rights of his partners.

This is not a case of a constructive trust or an innocent failure to divulge upon which the law imposes liability. This is a case of a flagrant violation of a fiduciary obligation. I therefore hold that Harris was acting in a fiduciary capacity under the Bankruptcy Act when his debt to the plaintiffs was created, and that, on the basis of my earlier finding of fraud, the debt is nondischargeable under Section 17(a)(4).

Because I have already held that the judgment debt is nondischargeable on two grounds, I need not decide whether the Bankruptcy Judge erred when he refused to permit the plaintiffs to assert nondischargeability under Section 17(a)(8) of the Bankruptcy Act.

The judgment of the Bankruptcy Court holding that the judgment debt owed by Harris to the plaintiffs was dischargeable in bankruptcy is reversed and the judgment debt is hereby declared to be nondischargeable.

---

7. "If the act embrace such a debt [a factor retained the money of his principal], it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act." *Chapman v. Forsyth et al.*, 43 U.S. (2 How.) 202, 207, 11 L.Ed. 236 (1844).