**In re Sateesh APTE, Debtor.**

**ROMESH JAPRA, M.D., F.A.C.C., INC., a California professional corporation, Appellant,**

**v.**

**Sateesh APTE, Appellee.**

Bankruptcy Nos. 92–45858–JT, 92–46447–TK.

BAP No. NC–94–1567–JRO.

Adv. No. 92–4634–AN.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Feb. 23, 1995.

Decided April 13, 1995.

---

Patric J. Kelly, Randy M. Hess and Duane W. Shewaga, Adleson, Hess, Christensen & Kelly, San Jose, CA, for appellant.

R. Kenneth Bauer, Walnut Creek, CA, for appellee.

Before JONES, RUSSELL and OLLASON, Bankruptcy Judges.

### OPINION

JONES, Bankruptcy Judge:

## I. FACTS

Appellee and Debtor, Sateesh Apte ("Dr. Apte"), is a neurologist. He is also the founder of several corporations, including Apte Group, Inc. ("Apte Group"), a management company. In August, 1989, Apte Group leased a 48,000 square foot office building in Pleasanton, California from Rosewood Associates ("Rosewood"). Dr. Apte intended to sublease the office space to other medical professionals, but was unable to secure subtenants. As a result, Apte Group fell over $1.3 million behind on lease payments.

On April 3, 1991, Rosewood filed an unlawful detainer action against Apte Group, prompting Dr. Apte to enter into workout negotiations in order to restructure the lease payments. Around June, 1991, Dr. Apte was approached by an acquaintance, Dr. Romesh Japra, about subleasing office space in the Pleasanton building. Although Dr. Japra had leased two other offices, he had never before negotiated a sublease. During sublease negotiations, Dr. Apte did not disclose to Dr. Japra that Apte Group was in default on the master lease and subject to eviction. He also failed to tell Dr. Japra when Rosewood officially terminated the master lease on July 23, 1991.

Dr. Japra knew that his sublease was subject to the master lease. As a result, he specifically requested that his sublease contain a provision ("the priority provision") that would allow him to remain in possession of the property even if the master lease were terminated. The priority provision was important to Dr. Japra because he intended to invest a lot of money in improvements in the office space. Dr. Japra signed the sublease agreement on September 16, 1991. That same day, a workout agreement between Dr.

Apte and Rosewood became effective, allowing Dr. Apte to cure his arrearage on the master lease.

Dr. Japra understood that his sublease had to be approved by Rosewood before it became effective. Two weeks after Dr. Japra signed the sublease, Dr. Apte told him that the sublease had been approved. The truth, however, was that Rosewood had refused to sign the sublease unless the priority provision was taken out.

Dr. Japra also understood that the sublease required him to obtain the written consent of Rosewood before commencing any improvements, but Dr. Apte represented that he would obtain the necessary approval. After Dr. Apte made repeated assurances to Dr. Japra and Dr. Japra's office manager that the sublease and improvements had been approved, Dr. Japra began construction on the improvements, expending a total of $146,727.46.

During the sublease negotiations, Dr. Japra had no contact with Rosewood. In fact, Rosewood refused to communicate with anyone but Dr. Apte, due to legal concerns that any communication directly with a potential sublessee might be interpreted as having created a lease between Rosewood and the sublessee. As a result, Dr. Japra's only contact was with Dr. Apte.

In December, 1991, Rosewood became aware that Dr. Japra was making improvements. Rosewood informed the city of Pleasanton not to issue any further work permits, and told Dr. Apte, on January 13, 1992, that construction was to be stopped immediately. Dr. Apte did not tell Dr. Japra to stop, yet he informed Rosewood that construction on the improvements had been halted. In fact, Dr. Apte testified that he participated in and encouraged the construction and that he visited Dr. Japra's space two or three times a week to make sure that the tenant improvements were within the guidelines set by Rosewood. Rosewood soon discovered that construction had not stopped, but allowed the construction to continue based on Dr. Apte's promise that Dr. Japra would consent to

deletion of the priority provision from the sublease.

In February, 1992, Dr. Apte finally told Dr. Japra that Rosewood had not approved the sublease. By this time, Dr. Japra had completed 95% of his improvements. Due to Dr. Apte's continued default on master lease payments, Rosewood filed another unlawful detainer action on March 18, 1992, only two weeks after Dr. Japra had moved into his offices. · The master lease was eventually terminated and Dr. Japra, after unsuccessfully trying to negotiate a lease with Rosewood, was evicted. His eviction occurred less than six months after he had moved in.

Dr. Apte filed a chapter 7 petition soon after the master lease was terminated. Dr. Japra filed a proof of claim based upon his damages, then filed an action on December 18, 1992, to have this debt declared nondischargeable pursuant to §§ 523(a)(2)(A) and 523(a)(6).[1] In his complaint, Dr. Japra alleged $146,727.46 in damages, consisting of $7,980.12 in rent paid to Dr. Apte (which Dr. Apte kept instead of forwarding to Rosewood) and over $138,000 spent on improvements and other costs associated with moving into the new office space.

The bankruptcy court held a hearing on January 31, 1994. On April 28, 1994, the court ruled that Dr. Apte had made material misrepresentations with the intent to deceive Dr. Japra. However, the court ruled that Dr. Japra did not reasonably or justifiably rely upon those misrepresentations because Dr. Japra was highly educated, was experienced in negotiating leases, and should have known that Dr. Apte was not telling the truth about approval of the sublease and construction plans. The court chastised Dr. Japra for beginning construction on the improvements without seeing signed copies of the approved sublease and authorization for improvements. The court therefore concluded that all the elements of fraud had been satisfied except for reliance and causation.

The court dismissed Dr. Japra's § 523(a)(6) claim, ruling first that fraud claims may only be brought under § 523(a)(2)(A), and then stating that even if fraud claims could be brought under § 523(a)(6), all the elements of fraud had to be proven in order to prevail. Therefore, Dr. Japra could not prevail under either § 523(a)(2)(A) or § 523(a)(6), and the debt was dischargeable. Dr. Japra appeals.

## II. ISSUES

1. What is the proper standard of reliance under § 523(a)(2)(A)?

2. Was the judge's factual finding that Dr. Japra did not satisfy the reliance element clearly erroneous?

3. Did the bankruptcy court err in holding that Dr. Japra did not have a cause of action under § 523(a)(6)?

## III. STANDARD OF REVIEW

■ The proper standard of reliance to be applied in a § 523(a)(2)(A) action is a question of federal law. *See Grogan v. Garner,* 498 U.S. 279, 284, 111 S.Ct. 654, 658, 112 L.Ed.2d 755 (1991). The bankruptcy court's decision that Dr. Japra did not have a cause of action under § 523(a)(6) is also a question of law. We review a bankruptcy court's application of the law *de novo. In re Kirsh,* 973 F.2d 1454, 1456 (9th Cir.1992) (per curiam).

■ "The determination of justifiable reliance is a question of fact subject to the clearly erroneous standard of review." *Id.* at 1456.[2] A factual finding is clearly erroneous if, after examining the evidence, the reviewing court "is left with the definite and firm

---

1. Unless otherwise indicated, all references to Chapters, Sections or Rules are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001, *et seq.*

2. *But see id.* at 1462 (Fernandez, J., concurring in part and dissenting in part) (stating that "because the legal standard for judging whether reliance is justifiable requires us to determine, by reference to 'the 'data of practical human experience' whether an individual's reliance was justified, 'the trial court's findings of fact effectively determine our legal conclusion,'" thus making the issue of justifiable reliance a mixed question of fact and law) (quoting *United States v. McConney,* 728 F.2d 1195, 1204 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)).

conviction that a mistake has been committed." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

## IV. DISCUSSION

### A. *The Proper Standard of Reliance in a § 523(a)(2)(A) Action*

Section 523(a)(2)(A) provides that

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A) (1994).

■ It is well-settled that a creditor alleging actual fraud must prove five elements: (1) the debtor made a material misrepresentation, (2) with knowledge of its falsity, (3) with the intent to deceive, (4) on which the creditor relied, and (5) due to which the creditor sustained loss or damage. *See Kirsh,* 973 F.2d at 1457; *In re Britton,* 950 F.2d 602, 604 (9th Cir.1991); *In re Rubin,* 875 F.2d 755, 759 (9th Cir.1989).

■ The first issue on appeal is the type of reliance a plaintiff must show in order to prevail in a § 523(a)(2)(A) proceeding. The bankruptcy court stated in its Findings of Fact, Opinion, and Conclusions of Law ("opinion") that the Ninth Circuit has applied three different standards of reliance in its prior decisions: actual, reasonable and justifiable. The bankruptcy court rejected actual reliance as too favorable for creditors. The bankruptcy court then concluded that Dr. Japra had failed to prove either reasonable or justifiable reliance.

Dr. Japra argues that actual reliance should be the correct standard, citing *In re Ophaug,* 827 F.2d 340 (8th Cir.1987). In *Ophaug,* the court pointed out that

§ 523(a)(2)(B) included a specific "reasonableness" requirement. Therefore, the court reasoned, § 523(a)(2)(A)'s lack of a reasonableness requirement meant that only actual reliance is necessary to establish actual fraud. *Id.* at 342–43. However, we have previously considered and rejected this reasoning, *In re Howarter,* 114 B.R. 682, 685 (9th Cir. BAP 1990), as has the Ninth Circuit. *Kirsh,* 973 F.2d at 1459–60. As we pointed out in *Howarter,* we believe Congress meant to incorporate the common law elements of fraud in drafting the language of § 523(a)(2)(A), which require more than actual reliance. *Howarter,* 114 B.R. at 685–86; *Kirsh,* 973 F.2d at 1457–58.

Until recently, Ninth Circuit decisions involving reliance required a showing of "reasonableness." *In re Siriani,* 967 F.2d 302, 304 (9th Cir.1992); *In re Jogert, Inc.,* 950 F.2d 1498, 1505 (9th Cir.1991); *Howarter,* 114 B.R. at 685–86; *In re Pascucci,* 90 B.R. 438, 444 (Bankr.C.D.Cal.1988); *but see In re Rubin,* 875 F.2d 755, 759 n. 2 (9th Cir.1989) (declining to decide if reasonable reliance was the correct standard). However, the Ninth Circuit recently clarified these decisions, holding that "justifiable" reliance was the correct standard to be applied in § 523(a)(2)(A) actions. *Kirsh,* 973 F.2d at 1457.

■ The court in *Kirsh* compared cases from other circuits in deciding that although courts referred to the reliance standard as "actual," "justifiable," or "reasonable," in reality all courts applied a "justifiable" standard. The court in *Kirsh* described "reasonable" reliance as a purely objective standard, while "justifiable" reliance was a mixture of objective and subjective standards, "which takes into account the knowledge and relationship of the parties themselves." *Id.* at 1458.

Because the bankruptcy court in the instant appeal specifically held that Dr. Japra did not satisfy *Kirsh's* justifiable reliance standard, the bankruptcy court did not err in its application of the appropriate standard of reliance.

### B. Application of the Justifiable Reliance Standard

Dr. Japra next challenges the bankruptcy court's factual conclusion that he did not justifiably rely upon Dr. Apte's numerous misrepresentations. A bankruptcy court's factual finding will not be overturned if its "account of the evidence is plausible in light of the record viewed in its entirety." *Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511. We also accord deference to the bankruptcy court's opportunity to assess the witnesses' credibility. Fed.R.Bankr.P. 8013.

Dr. Apte cautions us that § 523(a) "should be strictly construed against the objecting creditor and liberally in favor of the debtor" in order to effectuate the Bankruptcy Code's fresh start policy. 3 *Collier on Bankruptcy* ¶ 523.05A at 523–19 (15th ed. 1994). However, the fresh start policy is only intended to benefit the "honest but unfortunate debtor." *Garner,* 498 U.S. at 287, 111 S.Ct. at 659 (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). After reviewing the bankruptcy court's factual finding that Dr. Japra did not justifiably rely, we are left with "the definite and firm conviction that a mistake has been committed." *Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511.

### 1. The Legal Standard

■ The Ninth Circuit thoroughly explained the justifiable reliance standard in *Kirsh.* The general rule is that a person may justifiably rely on a representation even if the falsity of the representation could have been ascertained upon investigation. *Kirsh,* 973 F.2d at 1458 (citing *Restatement (Second) of Torts* § 540 (1977)). In other words, "negligence in failing to discover an intentional misrepresentation is no defense." *Kirsh,* 973 F.2d at 1459 (citing *Seeger v. Odell,* 18 Cal.2d 409, 115 P.2d 977, 981 (1941)). However, a person cannot rely on a representation if "he knows that it is false or its falsity is obvious to him." *Kirsh,* 973 F.2d at 1458 (quoting *Restatement (Second) of Torts* §§ 545A, 541 (1977)). In sum, although a person ordinarily has no duty to investigate the truth of a representation, "a person cannot purport to rely on preposter-

ous representations or close his eyes 'to avoid discovery of the truth.'" *Kirsh,* 973 F.2d at 1459 (quoting *Seeger,* 18 Cal.2d 409, 115 P.2d at 981 (citing Prosser on the Law of Torts at 749 (1941))).

### 2. The Legal Standard Applied to Dr. Apte's Misrepresentations

■ Dr. Apte conducted a calculated series of material misrepresentations and nondisclosures. First, he carried on sublease negotiations with Dr. Japra without disclosing: (1) that he was $1.3 million in default on the master lease; (2) that Rosewood had instituted unlawful detainer actions; (3) that Rosewood had officially terminated the master lease; and (4) that Rosewood would never accept a lease containing a priority provision. Second, Dr. Apte assured Dr. Japra's office manager on several occasions that both the sublease and construction plans had been approved, and gave plausible excuses for the delay in providing copies of the written approvals. Third, Dr. Apte participated in and encouraged the construction of the improvements. Finally, Dr. Apte failed to disclose to Dr. Japra that Rosewood had discovered the improvements and had demanded that Dr. Japra halt construction.

■ (i) *Nondisclosure.* The bankruptcy court, in holding that Dr. Japra did not justifiably rely, failed to take into account that much of Dr. Apte's fraudulent conduct consisted of nondisclosures. If a party is guilty of nondisclosure, "it is impossible to demonstrate reliance, since to do so requires proof of a speculative state of facts, i.e. how one would have behaved if omitted material information had been disclosed." *In re Demarest,* 176 B.R. 917, 921 (Bankr.W.D.Wash.1995). In other words, a plaintiff alleging nondisclosure does not have to present positive proof of reliance—the mere withholding of a material fact in the face of a duty to disclose establishes the requisite causation. *Demarest,* 176 B.R. at 921–22 (quoting *In re Harris,* 458 F.Supp. 238 (D.Or.1976), *aff'd, Matter of Harris,* 587 F.2d 451 (9th Cir.1978), *cert. denied, Harris v. Inahara,* 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979) (quoting *Affiliated Ute Citizens v. United States,* 406

U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972)).

Dr. Japra testified, and the record supports his testimony, that he would have never entered into a sublease had he known that Dr. Apte was in default and that Rosewood would not accept a priority provision. In addition, had Dr. Apte disclosed that Rosewood had demanded that construction work stop, Dr. Japra could have halted construction and mitigated his damages. In reaching its conclusion that Dr. Japra did not justifiably rely, the bankruptcy court erred in not considering the effect of Dr. Apte's nondisclosures on Dr. Japra's reliance.

(ii) *Misrepresentations.* After focusing primarily on Dr. Apte's misrepresentations, the bankruptcy court concluded that Dr. Japra was not justified in proceeding with over a hundred thousand dollars of improvements without seeing signed copies of the approved sublease and construction plans. We hold that this factual finding is clearly erroneous.

In considering whether reliance is justifiable, the court must take into account "the knowledge and relationship of the parties." *Kirsh,* 973 F.2d at 1458. The bankruptcy court, in placing a duty upon Dr. Japra to investigate Dr. Apte's representations, relied on the fact that Dr. Japra was "highly educated" and experienced in lease negotiations. However, a degree in medicine does not make someone an expert in real estate transactions. In addition, Dr. Japra testified that he had never negotiated a sublease before, and his mere knowledge that foreclosure of the master lease would terminate his sublease is insufficient to establish Dr. Japra as an expert.

Also of importance is the fact that Dr. Japra was not represented by legal counsel during the sublease negotiations. Although this fact reinforced the bankruptcy court's opinion that Dr. Japra was an expert, it also indicates that Dr. Japra did not have the assistance necessary to make informed business judgments.

Finally, we note that Rosewood refused to have any communication with Dr. Japra, thereby limiting Dr. Japra's access to material information and his ability to conduct an independent investigation of Dr. Apte's representations. In short, the bankruptcy court improperly placed a duty on Dr. Japra to investigate Dr. Apte's representations.

We therefore reverse the bankruptcy court's factual finding that Dr. Japra did not justifiably rely. Because the bankruptcy court's finding that Dr. Japra did not show proximate cause necessarily hinged upon the court's finding that there was no justifiable reliance, we also reverse the court's finding that there was no proximate cause. *See Basic Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988) (holding that reliance establishes "the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury"). As a result, we order that the bankruptcy court enter judgment for Dr. Japra on his § 523(a)(2)(A) claim and hold the debt nondischargeable.

### C. *The Mutual Exclusivity of §§ 523(a)(2)(A) and 523(a)(6)*

Dr. Japra's second claim for relief was nondischargeability of the debt pursuant to § 523(a)(6). Section 523(a)(6) provides that

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a)(6) (1994).

To prevail under § 523(a)(6), a party must prove 3 elements: (1) willful conduct, (2) malice, and (3) causation. *Britton,* 950 F.2d at 605. In order for the debtor's conduct to qualify as "willful," the debtor need only have "the intent to do the act at issue, not intent to injure the victim." *Id.; but see In re Kaplan,* 162 B.R. 684, 703 (Bankr.E.D.Pa.1993) (recognizing national split of authority as to whether the debtor must have had specific intent to harm the plaintiff). To demonstrate malice, the plaintiff does not have to show that the debtor intended to injure the plaintiff; it is sufficient if the debtor had actual knowledge or it was reasonably foreseeable that the debtor's

conduct would result in injury to the plaintiff. *Britton,* 950 F.2d at 605. Finally, to demonstrate proximate cause, the plaintiff must show that the injury was a necessary product of the harmful act. *In re Cecchini,* 780 F.2d 1440, 1443 (9th Cir.1986).

The bankruptcy court, in footnote one of its opinion, concluded that Dr. Japra's action was the "paradigmatic case" under § 523(a)(2)(A) to the exclusion of § 523(a)(6). The court cited *In re Levy,* 951 F.2d 196, 199 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992), as authority for its conclusion. The bankruptcy court then stated in its opinion that even if Dr. Japra had a claim under § 523(a)(6), he would still have to prove all the elements of actual fraud in order to prevail. These two conclusions are both erroneous interpretations of the law.

### 1. Are §§ 523(a)(2)(A) and 523(a)(6) Mutually Exclusive?

The bankruptcy court based its conclusion that §§ 523(a)(2)(A) and 523(a)(6) are mutually exclusive on dicta in *Levy.* In *Levy,* the Ninth Circuit analyzed a footnote in *Grogan v. Garner,* 498 U.S. 279, 282 n. 2, 111 S.Ct. 654, 657 n. 2, 112 L.Ed.2d 755 (1991) and a footnote in *In re Rubin,* 875 F.2d 755, 758 n. 1 (9th Cir.1989), concluding that these two cases suggested a "regime" in which "a creditor should seek nondischargeability of a debt for fraud alone under section 523(a)(2)," and seek nondischargeability under § 523(a)(6) where "the debtor inflicted 'willful or malicious injury,' such that punitive damages were awarded." *Levy,* 951 F.2d at 199.

To the extent the bankruptcy court concluded that *Levy* establishes a rule of law that § 523(a)(2)(A) and § 523(a)(6) are mutually exclusive, the bankruptcy court erred. The actual issue discussed in the cases cited by *Levy* was whether punitive damages for fraud could be excepted from discharge under § 523(a)(2)(A). Although neither *Garner* nor *Rubin* resolved the issue, *Levy* agreed with the majority of courts in holding that punitive damages may be excepted from discharge under § 523(a)(6), but not under § 523(a)(2)(A). *Levy,* 951 F.2d at 199; *see*

*also Stokes v. Ferris,* 150 B.R. 388, 391 (W.D.Tex.1992), *aff'd, Matter of Stokes,* 995 F.2d 76 (5th Cir.1993) (per curiam). None of these cases stands for the proposition that a debtor's harmful acts cannot form the basis of a nondischargeability claim under both § 523(a)(2)(A) and § 523(a)(6)—in fact, the law is directly contrary. *Britton,* 950 F.2d at 604–05; *Matter of Maurice,* 21 F.3d 767, 773 (7th Cir.1994); *Matter of Stokes,* 995 F.2d at 77.

The "regime" suggested by *Levy* merely means that a plaintiff who is only seeking nondischargeability of *actual* damages may proceed under either § 523(a)(2)(A) or § 523(a)(6), but that if the plaintiff is seeking nondischargeability of *punitive* damages, he should bring suit solely under § 523(a)(6). *Stokes,* 150 B.R. at 392 (citing *Garner,* 498 U.S. at 282 n. 2, 111 S.Ct. at 657 n. 2). This reasoning, however, does not lead to the conclusion that § 523(a)(6) is limited exclusively to actions involving punitive damages. Many cases which arise under § 523(a)(6) concern the alleged conversion by the debtor of the plaintiff's property, *see, e.g., Cecchini,* 780 F.2d at 1443–44, or the alleged conversion by the debtor of property subject to a security interest. *See, e.g., In re Posta,* 866 F.2d 364, 365–66 (10th Cir.1989). The bankruptcy court read *Levy* too broadly and consequently erred as a matter of law.

### 2. Did Dr. Japra Plead a Cause of Action Under § 523(a)(6)?

The bankruptcy court also stated that even if Dr. Japra could maintain an action under § 523(a)(6), he would have to successfully prove all the elements of fraud in order to prevail. In effect, the bankruptcy court held that the prima facie case for a "willful and malicious injury" caused by misrepresentations under § 523(a)(6) is the same as that of "actual fraud" under § 523(a)(2)(A). This is not the law.

There are two major differences between the prima facie cases of § 523(a)(2)(A) and § 523(a)(6). As discussed in Part A above, "actual fraud" under § 523(a)(2)(A) requires a showing of a specific intent to deceive the plaintiff, while a "willful" injury under § 523(a)(6) does not require a showing of

specific intent to deceive the plaintiff, nor does it require a specific intent to harm the plaintiff. *See Cecchini,* 780 F.2d at 1442–43 (rejecting line of cases which required specific intent to injure). In addition, the plaintiff does not have to show that the debtor intended to injure the plaintiff in order to show "malice" under § 523(a)(6); he merely has to show "the debtor's actual knowledge or the reasonable foreseeability that his conduct will result in injury" to the plaintiff. *Britton,* 950 F.2d at 605.

On the other hand, "actual fraud" under § 523(a)(2)(A) requires only "the traditional tort inquiry of whether the subsequent losses were proximately caused by [the] misrepresentation," *In re Scarlata,* 112 B.R. 279, 292 (Bankr.N.D.Ill.1990), *aff'd in part, rev'd in part,* 127 B.R. 1004 (N.D.Ill.1991), (citing *In re Dougherty,* 84 B.R. 653, 656 (9th Cir. BAP 1988)), while the element of malice under § 523(a)(6) requires a stronger showing that the act "necessarily produced" the harm. *Scarlata,* 112 B.R. at 292; *see also Cecchini,* 780 F.2d at 1443. Dr. Apte's actions in this case satisfy all three elements of a § 523(a)(6) claim.

We hold that the bankruptcy court erred in ruling that Dr. Japra could not maintain an action under § 523(a)(6) without proving all the elements of actual fraud. In fact, the Supreme Court's reasoning in *Garner* indicates that part of Dr. Japra's claim might more properly have been brought under § 523(a)(6). In *Garner,* the Court stated that "[a]rguably, fraud judgments in cases in which the defendant did not obtain money, property or services from the plaintiff[] ... are more appropriately governed by § 523(a)(6)." *Garner,* 498 U.S. at 282 n. 2, 111 S.Ct. at 657 n. 2. In the case at bar, Dr. Apte clearly "obtained" $7,980.12 from Dr. Japra—the money Dr. Japra paid Dr. Apte for rent and a security deposit. The other approximately $138,000 in damages incurred by Dr. Japra were the result of Dr. Apte's misrepresentations, but may not be "money, property or services" within the meaning of

§ 523(a)(2)(A).[3] They are arguably the result of Dr. Apte's "willful and malicious" misrepresentations to Dr. Japra. Because the bankruptcy court ruled that Dr. Japra could only prevail under § 523(a)(6) if he proved all the elements of actual fraud, the decision must be reversed. *See, e.g., In re Smith,* 160 B.R. 549, 553 (N.D.Tex.1993) (holding that a plaintiff bringing an action under § 523(a)(6) does not have to prove an independent tort such as fraud, and therefore allowing a claim based upon misrepresentations without proof of reliance); *In re Wolfson,* 148 B.R. 638, 643 (Bankr.M.D.Fla.1992) (holding that a willful sale of collateral in disregard to a secured creditor's rights is actionable under § 523(a)(6) even in the absence of actual fraud).

## V. CONCLUSION

Although the bankruptcy court was incorrect in stating that the Ninth Circuit currently uses three different reliance standards, it did apply the correct standard. However, we hold that the bankruptcy court's factual finding that Dr. Japra did not justifiably rely on Dr. Apte's material misrepresentations is clearly erroneous. This finding is hereby **REVERSED** and the bankruptcy court is ordered to enter judgment in favor of Dr. Japra under § 523(a)(2)(A), rendering his claim for $146,727.46 nondischargeable.

The bankruptcy court also erred to the extent that it held that § 523(a)(2)(A) and § 523(a)(6) are mutually exclusive, and in its ruling that Dr. Japra had no cause of action under § 523(a)(6). However, since we have already ordered that judgment in Dr. Japra's favor under § 523(a)(2)(A) be entered, we need not address the merits of his § 523(a)(6) claim.

---

3. Dr. Apte has never argued that the $138,000 was not damages under § 523(a)(2)(A) because it was not "money, property or services" obtained by Dr. Apte. Since this is a factual determination, we do not consider it on appeal. Indeed,

Dr. Japra might be able to establish that since Dr. Apte was the master lessee, the improvements were in fact "property obtained by" Dr. Apte.