In re Lanny Dene DIEL, Christine Dawn Diel, Debtors.

Farmers State Bank—Hardtner, Plaintiff,

v.

Lanny Dene Diel, Christine Dawn Diel, Defendants.

Bankruptcy No. 00–10618.
Adversary No. 00–5145.

United States Bankruptcy Court, D. Kansas.

May 16, 2002.

Lanny Dene Diel, Kiowa, KS, pro se.

Christine Dawn Diel, Kiowa, KS, pro se.

Edward J. Nazar, Redmond & Nazar, L.L.P., Wichita, KS, trustee.

## *MEMORANDUM AND OPINION*

ROBERT E. NUGENT, Bankruptcy Judge.

This matter came before the Court for evidentiary hearing on April 2, 2002 on Farmers State Bank of Hardtner's Complaint to Determine Dischargeability of Debt. In its complaint, Farmers State Bank sought to have Diel's debt excepted from discharge under 11 U.S.C. § 523(a)(2)[1] for making false financial statements and under § 523(a)(6) for willful and malicious injury to the Bank's property. In addition, Farmers State Bank sought to have Diel's discharge denied alleging that Diel defrauded the bank under § 727(a)(2), concealed and falsified recorded information from which his financial condition or business transactions might be ascertained under § 727(a)(3), and that Diel knowingly and fraudulently made a false oath or account in connection with his case under § 727(a)(4). At the conclusion of its evidence, Farmers State Bank withdrew its § 727 objections to discharge. The Court is therefore concerned with whether Farmers State Bank's debt should be excepted from discharge under §§ 523(a)(2)(A) and (a)(6). After careful review of the record and relevant law, the Court finds that Diel's debt to Farmers State Bank is excepted in the amount of $8,409.65, the sum of the Boevers checks as funds obtained by actual fraud.

### *FACTS*

Lanny Diel, debtor, began farming independent of his father, Virgil Eugene Diel, in 1992. He farmed in the area around Kiowa, Kansas, near to the Oklahoma state line. At or about this time, he commenced a banking relationship with plaintiff, Farmers State Bank of Hardtner. Diel owned no ground and conducted his entire cropping operation on rented land which he leased from his father and others. Diel also engaged in custom baling work, custom cattle work, and he worked for wages in the farming operation of Mike Yazel.

In 1997, Diel's farming operation ran into financial problems. Farmers State Bank asked him to move his loan to another institution due to continuing delinquency issues. Farmers State Bank holds two security agreements, one dated June 30, 1992 and the other dated January 20, 1995. The 1992 Security Agreement was executed by Virgil Diel only and purports to hypothecate to Farmers State Bank an interest in the father's anhydrous ammonia applicator and a New Holland swather. This security agreement was given to secure Lanny Diel's notes. The 1995 security agreement grants to Farmers State Bank a security interest in all of Lanny Diel's livestock, machinery, equipment, crops and general intangibles. Notably, the agreement fails to reference accounts and omits any description of the land on which Diel's crops were growing. Both security agreements are on standard bank forms and bear a legend at the bottom reciting "THIS AGREEMENT INCLUDES AND IS SUBJECT TO THE ADDITIONAL PROVISIONS SET FORTH ON THE REVERSE SIDE HEREOF, SUCH PROVISIONS BEING INCORPORATED HEREIN BY REFERENCE." Regrettably, neither the copies of these agreements placed in evidence, nor those filed as exhibits to the Bank's motion for stay relief or its proof of claim include the reverse sides and the "incorporated" provisions allegedly set forth are nowhere in the record before the Court

---

1. All statutory references are to the Bankruptcy Code, Title 11, United States Code, unless otherwise noted.

today. The Court suspects that these provisions included matters conditioning or limiting Diel's right to use the collateral and its proceeds. Both Diel and David Collins, his former loan officer (no longer working for the Bank), testified that the course of dealing between them was that when Diel sold collateral of any kind, he was to bring the proceeds to the Bank for application on his notes. Sometimes, he would be permitted to utilize some of the proceeds to pay farming bills. As his financial condition deteriorated, however, he was rarely granted this permission.

In May 1999, the Diels opened a checking account at the Alva State Bank & Trust Company in Alva, Oklahoma. Christine Diel was employed in Alva at that time. Several of the transactions questioned by the Bank were run through this account. Diel testified that he opened this account after the Bank refused to either advance him funds for his operation or allow him to use any collateral proceeds. He stated unequivocally that he used the account to avoid the Bank taking all of his deposits. After Diel harvested his wheat in June of 1999, his father took over his leased ground and, as Diel testified, he knew he would shortly be out of farming. Diel did no cultivation in 1999 or afterward, instead working as a custom baler and cattleman, and also working for wages for Mark Yazel. It is clear that, by mid–1999, Diel's operation was headed for liquidation.

The Bank complains of several specific transactions which it contends demonstrate either Diel's fraudulent conduct or his willful and malicious damage to the Bank's security interest. In July of 1998, Diel sold hay to Cody Boevers of Verden, Oklahoma. Boevers paid by checks in the amount of $4,048.20 and $4,361.45. Diel deposited these checks in the Bank. Both checks were returned by Boevers' bank marked "insufficient funds." Collins encouraged Diel to take further collection action against Boevers and to file bad check charges. Diel advised Collins that he would take further collection action, but instead, Diel obtained cash from Boevers in the amount of the bad checks. This cash was never turned over to the Bank. Indeed, even at Diel's Rule 2004 examination on June 5, 2000, Diel testified that he had made no sales of hay for cash. However, at trial, Diel admitted that he had not accounted to the Bank for the cash because he did not want the Bank to know he had spent the money. He stated that he did not think this was wrongful conduct, merely that he needed the money and that the money was channeled into farm expenses, building corrals, paying wages and buying fuel.

Additionally, during the 1999—2000 period, Diel worked for and with Mark Yazel in a variety of ways. He was paid wages for farm labor. In addition, he cared for Yazel's cattle. He did this by allowing the cattle to run on his leased ground while it was planted in wheat. The Bank claims a security interest in his crops. Apparently what wheat was not "grazed up" by Yazel's cattle was chopped before it matured and turned into "wheatlage" and kept in sacks for later feeding or sale. Yazel testified at trial that he believed most of the feed given to his cattle was in fact his own, and not Diel's. There is no definitive evidence whatsoever concerning the amount of Diel's wheat fed to Yazel's cattle. Yazel did testify that he bought silage from Diel for $8,251 and that he bought cattle from Diel for $7,818. These purchases, made in 1997 and 1998, were paid for with checks that, according to Diel's undisputed testimony, were deposited in the Bank. There are a series of checks from Yazel to Diel which were deposited in the Alva account after May of 1999, but, with one exception, there is no proof as to the extent to which

these checks included actual proceeds of Bank collateral. On December 10, 1999, Diel deposited a check from Yazel in the amount of $4,797.12 which Diel testified was the proceeds of the sale of hay to Yazel. The balance of the checks are either for wages (in which the Bank claims no security interest) or for "cattle care." Diel's testimony that he felt his actions were not wrongful because the Bank had no interest in these payments is somewhat disingenuous because Diel clearly consumed property intended to be Bank collateral in his rendering of valuable services to Yazel. Nevertheless, because "cattle care" involves a combination of labor, supplies, and pasture rent, the Bank did not prove what of the Bank's collateral, if any, went into the rendering of these services and therefore the Court cannot find what part, if any, of the cattle care payments are proceeds of the collateral.

Lastly, the Bank also complains that Diel should be held accountable for the proceeds of the anhydrous applicator his father sold at a farm auction. This implement had been pledged by the father as security for Diel's debt at the Bank. Sometime in 2000, Gene Diel sold the applicator at auction. Lanny Diel denied any involvement in the sale and the Bank produced no evidence of what the applicator brought or the fate of the proceeds, other than that the Bank did not receive them. The Bank did not prove either that Lanny Diel took part in the auction or that he received any part of the proceeds.

## JURISDICTION

This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(I).

## ANALYSIS

### Exception to Discharge under § 523(a)(2).

■ The discharge provisions of § 523 will be strictly construed against the creditor and liberally construed in favor of the debtor. *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir.1997). To prevail on a nondischargeability claim under § 523(a)(2)(A) [2], a creditor must prove by a preponderance of the evidence that (1) the debtor made a false representation; (2) the debtor had the intent to deceive the creditor; (3) the creditor relied on the debtor's conduct; (4) the creditor's reliance was justifiable; and (5) the creditor was damaged as a proximate result. *Fowler Bros v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir.1996); *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The fraudulent intent element need not be shown by direct evidence, but may be inferred from the totality of the circumstances. *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000) (citation omitted). "The bankruptcy court must consider whether the totality of the circumstances 'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.'" *Davis*, at 652 (quoting 3 William L. Norton, Jr., *Norton Bankruptcy Law and Practice 2d* § 47:16, n. 62 (1999) (citation omitted)). "The court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides an indication of the debtor's state of mind at the time of the action-

---

**2.** Section 523(a)(2) excepts from discharge any debt "for money property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

able representations." *Davis,* at 652 (citation omitted).

■ Here, the Bank correctly contends that Diel committed actual fraud by retaining Boever's checks and seeking payment in cash which was not turned over to the Bank. Although Diel allowed the Bank to think he would pursue collection of the bad checks, Diel instead arranged with Boevers to receive cash which he then used for other purposes. Diel's guilty conscience in this connection is amply demonstrated by his misleading statement made even after the petition was filed. At the June 2000 Rule 2004 examination, Diel testified that he was never compensated for the hay he sold to Boevers.[3] At trial, Diel recanted this testimony, admitting that he had received cash from Boevers in the amount of the two dishonored checks, and stating that he did not want the Bank to know he spent the funds on something other than debt service. This is clearly evidence of actual fraud—a statement or omission made with intent to deceive that the Bank justifiably relied on to its detriment. Therefore, $8,409.65, the amount of the Boever's checks which should have been turned over to the Bank, is excepted from discharge under § 523(a)(2)(A).

*Exception to Discharge under § 523(a)(6).*

■ The Bank also seeks to have its debt excepted from discharge under § 523(a)(6) which excepts from discharge any debt for willful and malicious injury by the debtor to another entity or to the property of another entity. *See* § 523(a)(6). Section 523(a)(6) generally relates to torts and not to contracts, however, secured creditors whose collateral has been disposed of by the debtor often assert nondischargeability claims under § 523(a)(6) on the theory that the security

interest was willfully and maliciously converted. Transfers in breach of a security agreement may give rise to nondischargeability when the debtor's conduct is knowing and certain to cause financial harm. *See* 4 *Collier's on Bankruptcy* § 523.12[1] (15th Ed. Rev.2001). "Unless the creditor can prove not only that the debtor knew of the security interest, but also that the debtor knew that a transfer of the property was wrongful and certain to cause financial harm to the creditor, the debt should not be found nondischargeable." *Id.* Creditor objecting to discharge of debt under § 523(a)(6) must prove by a preponderance of the evidence both "willfulness" and "maliciousness." *In re Longley,* 235 B.R. 651, 655 (10th Cir. BAP 1999). To be "willful," the debtor "must intend that conversion of the collateral injure the creditor or the creditor's lien interest." *Longley,* at 657 (This is the standard in light of *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)). Willful injury may be established by indirect evidence of both the debtor's knowledge of the creditor's lien rights and the debtor's knowledge that the conduct will cause a particularized injury. *Id.* (citation omitted).

■ Diel's depositing of Mark Yazel's check for hay at Alva State Bank would constitute malicious damage, provided the Bank's security interest was valid. Diel was clearly authorized to sell collateral, but had a duty to account for its proceeds to the Bank. To determine if the Bank has borne its burden, the Court must first determine if the Bank in fact had a valid property interest in the hay which was sold. If it did, the Court must then determine whether Diel transferred the hay with knowledge that the transfer was

---

**3.** *See* Bank's Exhibit 13. Diel's Rule 2004 deposition testimony regarding the Boever's checks begins on page 33, line 12, and continues to page 34, line 2.

wrongful and that the Bank would be harmed by it.

However, the Court determines that the Bank's security interest is not valid as to Diel's crops. The security agreement refers to "crops" but does not include a description of the real property on which they are growing. This is clearly required by Kan. Stat. Ann. § 84–9–203(1)(a) which states, in part, "when the security interest covers crops growing or to be grown ... [the security agreement shall include] a description of the land concerned." This case was filed on March 1, 2000, before the effective date of the Kansas version of revised Article Nine and the former law still applies. *See* Kan. Stat. Ann. § 84–9–702(c)(2001 Supp.). The land descriptions are included in the financing statements but this, standing alone, does not suffice to render the Bank's security interest enforceable. *See Garst Seed Co. v. Wilson,* 17 Kan.App.2d 130, 833 P.2d 138 (1992).

■ Further, the sale of Gene Diel's applicator and Gene Diel's apparent failure to account to the Bank for the proceeds is not "willful and malicious injury" caused by Diel. Diel did not participate in the sale or share in the proceeds. Lanny Diel cannot be said to have "injured" the Bank. If the Bank has a claim or cause of action concerning the applicator, it would appear to be against Gene Diel and not the debtor.

Lastly, the details of the Yazel cattle care transactions are simply not sufficiently fleshed out in the evidence to support judgments under either §§ 523(a)(2) or (a)(6). This Court has been provided no useful information upon which it could base a finding that the Bank has been damaged in an amount certain by Diel's conduct. While it may well be that some of the Bank's collateral was sold or converted by Diel in his dealings with Yazel, and while the debtor's conduct is at best

troubling, this Court cannot determine how much wheat, if any, was sold, fed to cattle, or otherwise disposed of. The Bank had the burden to prove this fact to the Court by a preponderance of the evidence. Lacking such proof, the Court is left to conclude that Diel rendered services to Yazel for which Yazel paid. The Bank claimed no security interest in accounts receivable. Other than livestock, crops and equipment, the Bank only claimed a lien on general intangibles. General intangibles are distinguished from accounts in former Kan. Stat. Ann. § 84–9–106 and are defined as any personal property *other than* "goods, accounts, chattel paper, documents, instruments, rights to proceeds or written letters of credit, investment property, and money." *See* Kan. Stat. Ann. § 84–9–106 (2000) (emphasis added). Diel's right to collect money from Yazel for services rendered or goods sold is not a general intangible. Thus, this Court must find that the Bank has failed to bear its burden of proving that Diel's transactions with Yazel resulted in malicious injury warranting an exception from Diels' discharge. The Bank has not only failed to quantify the extent of its damage in this regard, but also to demonstrate that its property interests, at least where the Yazel transactions are concerned, have been damaged at all.

Therefore, THE COURT FINDS that the amount of $8,409.65, the sum of the Boevers checks as funds obtained by actual fraud is excepted from debtor's discharge. The limitation of the Court's judgment to this amount and extent is more the product of the Bank's failure to prove its case in several critical aspects, than of any confidence the Court may have in the integrity of debtor's practices, most of which the Court finds disturbing at best. Had the Bank proven an enforceable security interest in Diel's crops and demon-

strated with some precision what portion of its property, if any, was damaged by Diel in connection with the Yazel transaction, the amount excepted from Diel's discharge would be substantially in excess of that contained in this Order.

IT IS SO ORDERED.