335 B.R. 376 (2005)
In re Sheldon M. LITTLE, Debtor.
CMEA Title Agency, Inc., Plaintiff,
v.
Sheldon Little, Defendant.
Bankruptcy No. 04-21457. Adversary No. 05-01107.
United States Bankruptcy Court, N.D. Ohio, Eastern Division.
December 22, 2005.
*377 *378 *379 *380 Harvey A. Snider, Solon, OH, for Debtor.

MEMORANDUM OF OPINION AND ORDER
RANDOLPH BAXTER, Chief Judge.
The matter before the Court is CMEA Title Agency, Inc.'s ("CMEA") Complaint to Determine Dischargeability of Debt of Sheldon Little ("Little"). The Court acquires core matter jurisdiction over this proceeding under 28 U.S.C. § 157(b)(2)(J) and General Order No. 84 of this District. Upon an examination of the parties' respective briefs and supporting documentation, and after conducting a trial on the matter, the following findings of fact and conclusions of law are hereby rendered:

*
On or about February 2, 1994, Little purchased certain real estate (the "Real Estate") located at 18700 Invermere in Cleveland, Ohio for approximately $58,000. Chase Manhattan Mortgage Corporation took a mortgage on the Real Estate in exchange for providing Little with the financing to acquire the Real Estate.
In 2001, Little allegedly sold the Real Estate to Albert Reynolds ("Reynolds"), for the purpose of allowing a friend, Ivey ("Ivey"), to live in the house. CMEA alleges that in order to assist Reynolds in obtaining a loan from Conseco, Little prepared and submitted false financial information on behalf of Reynolds, including counterfeit checks and a fraudulent land installment contract. Reynolds defaulted on the loan, and is currently in arrears by more than $95,000.
After closing the sale of the Real Estate to Reynolds, CMEA, as title agent, failed to record the mortgage granting a lien to Conseco (predecessor to Citifinancial). As a result, Little continued to receive certain tax and utility bills.
CMEA alleges that Little had a sophisticated understanding of the mortgage lending and real estate industries, and initiated *381 a transaction with Ivey's mother, Akilah Ashraf ("Ashraf), whereby Little would transfer the Real Estate to Ashraf through a quitclaim deed on or about June 30, 2003. CMEA alleges that Little persuaded Ashraf to take out a loan for $65,000 from Washington Mutual Bank ("Washington Mutual"), with Ashraf retaining a portion of the loan proceeds, and directing $30,000 to be directed to a friend of Little, LaDonna Hatcher ("Hatcher"). CMEA also alleges that Little coordinated the preparation of the paperwork for the loan and received payment for serving as the loan officer for the transaction.
Washington Mutual recorded its mortgage, thereby obtaining a superior lien position to Conseco's unrecorded mortgage. Conseco later assigned the note and mortgage to Citifinancial Mortgage Co. ("Citifinancial").
Because an agent of CMEA was responsible for failing to record the mortgage, CMEA paid Citifinancial for its loss. In exchange, CMEA received an assignment of rights against Little from Citifinancial. Paragraph 2 of the Assignment of Claims assigns to CMEA all rights against Little all rights, claims, and causes of action relating to the Real Estate.[1] Pursuant to this assignment, CMEA brings this action as successor in interest to Citifinancial.
CMEA also maintains a foreclosure action regarding the subject property in the Cuyahoga County Court of Common Pleas, captioned Citifinancial Mortgage Co., Inc. v. Albert Reynolds, et al. (Case No. 03 510802) ("State Court Proceeding"). Little is a named co-defendant in the action. The Court is not aware of any other pending proceedings against Little, or in relation to the Real Estate.

* *
On September 7, 2004, Little filed a voluntary petition for relief under Chapter 7. Little's Schedule F ("Creditors Holding Unsecured Nonpriority Claims") includes Citifinancial (denoted as "Successor in Interest to Conseco Bank Inc.") for an amount of $10.00, and notes that the claim was entered "For Precautionary Purposes only." On February 24, 2005, the Chapter 7 Trustee filed a No-Asset Report. Accordingly, no proofs of claims were filed by any creditors, including CMEA.
CMEA commenced the above captioned adversary proceeding on March 4, 2005, seeking to determine the dischargeability of debt pursuant to 11 U.S.C. § 523(a)(6).[2] CMEA alleges that Little owes debts to CMEA arising from a willful and malicious injury resulting from a scheme of misconduct. Specifically, CMEA asserts that pursuant to § 523(a)(6), Little's debts are nondischargeable because they were obtained by 1) the willful and malicious conversion of the Real Estate in the sale from Little to Ashraf; and 2) the willful and malicious fraud in connection with Conseco's loan to Reynolds.
Little denies CMEA's allegations, and asserts that CMEA's injury is the result of the malfeasance, misconduct, and willful failure of its own employees to record the mortgage following the sale to Reynolds.

* * *
"A dischargeability action under 11 U.S.C. § 523(a)(6) encompasses `two distinct claims: (1) whether the debtor owes a debt to the plaintiff and (2) whether the debt owed by the debtor to the plaintiff is nondischargeable.'" In re Lombardo, 326 B.R. 901 (6th Cir. BAP 2005) (quoting In re Sweeney, 276 B.R. 186, 195 *382 (6th Cir. BAP 2002)). Section 523(a) provides, in relevant part,
(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b)of this title does not discharge an individual debtor from any debt 
(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;
11 U.S.C. § 523(a). The standard of proof for all of the dischargeability exceptions in 11 U.S.C. § 523(a) is a preponderance of the evidence standard. Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (holding that the preponderance of the evidence standard applied to all of the § 523 dischargeability exceptions, including the fraud discharge exception): In re Stern, 345 F.3d 1036, 1043 (9th Cir. 2003).
1. Existence of Debt
Initially, it must be determined whether the debtor owes a debt to the plaintiff. The term "debt" is defined by the Bankruptcy Code as a "liability on a claim." 11 U.S.C. § 101(12). "Based upon this definition, the Supreme Court of the United States has held that the terms `debt' and `claim' are essentially synonymous with one another." In re Indian River Estates, Inc., 293 B.R. 429, 433 (Bankr.N.D.Ohio 2003) (citing Pennsylvania Department of Public Welfare v. Davenport, 495 U.S. 552, 557, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990)). The term "claim" is defined by the Code as a
(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.
11 U.S.C. § 101(5). Where specific performance is sought in lieu of a monetary award, "a right to an equitable remedy for breach of performance is a `claim' if the same breach also gives rise to a right to a payment `with respect to' the equitable remedy. . . . The right to equitable relief constitutes a claim only if it is an alternative to a right to payment or if compliance with the equitable order will itself require the payment of money." Kennedy v. Medicap Pharmacies, Inc., 267 F.3d 493, 497 (6th Cir.2001).
Little was not a party to any agreement with CMEA, Citifinancial, or Conseco. The loan transaction involving Conseco was with Reynolds only. Further, there is no record that CMEA (or any of its predecessors in interest) has obtained a judgment lien against Little in a separate proceeding. In the pending state court proceedings, CMEA seeks to enforce its rights under the promissory note and mortgage, asking for a judgment against Reynolds in the amount of $94,914.78.[3] CMEA also asks for an order "compelling the transfer of the title from Sheldon Little to Albert Reynolds."[4] CMEA also includes a prayer for "all other relief, legal and equitable, as may be proper and necessary, including, for example, a writ of possession."[5]
The relief sought in CMEA's pending state court action sufficiently evinces the *383 existence of a claim it has against Little. CMEA's interest is derivative of its assigned rights from Citi, which was a successor in interest to Conseco.
2. Dischargeability of Debt
CMEA cites two grounds upon which Little's debt should be found to be nondischargeable. First, CMEA accuses Little of fraud in connection with Conseco's loan to Reynolds. Second, CMEA argues that, by transferring the Real Estate to Ashraf despite knowing that the property had previously been transferred to Reynolds, Little committed a willful and malicious conversion of the property.
To block the discharge of a debt under § 523(a)(6), a claimant must show that 1) the debtor's conduct was willful and malicious, 2) the creditor suffered an injury to its legal rights, and 3) the creditor's loss was caused by the debtor's conduct. See, e.g., In re Best, 109 Fed.Appx. 1, 5-6 (6th Cir.2004); In re Jones, 300 B.R. 133, 139 (1st Cir. BAP 2003). Although relevant state laws may be instructive, "what constitutes `willful and malicious injury' under § 523(a)(6) is a matter of federal law." In re Baldwin, 249 F.3d 912, 917 (9th Cir.2001); In re Taylor, 322 B.R. 306, 309 (Bankr.N.D.Ohio 2004).
"The willful and malicious standard is a stringent one." In re Best, 109 Fed.Appx. at 5 (citing Kawaauhau v. Geiger, 523 U.S. 57, 64, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)). "[N]ondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." Geiger, 523 U.S. at 61, 118 S.Ct. 974. In re Best, 109 Fed.Appx. at 5 (quoting In re Romano, 59 Fed. Appx. 709, 714-715 (6th Cir.2003)) ("An intentional or deliberate act alone does not constitute willful and malicious conduct under § 523(a)(6)."). "The Sixth Circuit has held that a willful and malicious injury as defined under § 523(a)(6) is one where the debtor `desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it.'" In re Moffitt, 252 B.R. 916, 922 (6th Cir. BAP 2000) (quoting In re Markowitz, 190 F.3d 455, 464 (6th Cir.1999)); In re Best, 109 Fed.Appx. at 5 (quoting In re Kennedy, 249 F.3d 576, 580 (6th Cir.2001)).
Although the "willful" and "malicious" requirements will be found concurrently in most cases, the terms are distinct, and both requirements must be met under § 523(a)(6). In re Martin, 321 B.R. 437, 440 (Bankr.N.D.Ohio 2004). "The word `willful' in [§ 523] (a)(6) modifies the word `injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." Geiger, 523 U.S. at 61, 118 S.Ct. 974. Lack of excuse or justification for the debtor's actions will not alone make a debt nondischargeable under § 523(a)(6). In re Markowitz, 190 F.3d at 465 n. 10.
When determining whether the debtor's conduct was willful, "in addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action." In re Sicroff, 401 F.3d 1101, 1106 (9th Cir.2005) (quoting In re Su, 290 F.3d 1140, 1146 n. 6 (9th Cir.2002)); In re Wood, 309 B.R. 745, 753 (Bankr.W.D.Tenn. 2004) ("To find that a debtor intended to cause the consequences of his act or believed that the consequences were substantially certain to result from his act, it is necessary to look into the debtor's mind, subjectively.").
The term malicious is defined as conduct taken in conscious disregard of *384 one's duties or without just cause or excuse. Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir.1986) (quoting Tinker v. Colwell, 193 U.S. 473, 486, 24 S.Ct. 505, 48 L.Ed. 754 (1904)). An injury has been defined as malicious under § 523(a)(6), when it is: "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." In re Sicroff, 401 F.3d at 1106 (citation omitted). "The definition of malice requires a heightened level of culpability transcending mere willfulness." In re Martin, 321 B.R. at 442. Mere "knowledge that legal rights are being violated is insufficient to establish malice. . . ." In re Best, 109 Fed.Appx. at 6 (quoting In re Mulder, 306 B.R. 265, 270 (Bankr.N.D.Iowa 2004)). This does not, however, require the debtor's conduct to be driven by a personal hatred directed at the creditor. In re Jones, 300 B.R. at 140 (citing Printy v. Dean Reynolds, Inc., 110 F.3d 853, 859 (1st Cir.1997)) ("`No special malice toward the creditor need be shown,' as malice can be present `even in the absence of personal hatred, spite or ill-will.'"); In re Thiara, 285 B.R. 420, 434 (9th Cir. BAP 2002); In re Fors, 259 B.R. 131, 137 (8th Cir. BAP 2001).
The injury sustained must be an invasion of the creditor's legal rights. In re Best, 109 Fed.Appx. at 6 ("[T]he word `injury' connotes legal injury (injuria) in the technical sense, not simply harm to a person."). "Injuries within the meaning of § 523(a)(6) are not confined to physical damage or destruction but also include an injury to intangible personal or property rights." In re Ellis, 152 B.R. 211, 215 (Bankr.E.D.Tenn.1993) (citing 3 COLLIER ON BANKRUPTCY ¶ 523.16 (15th ed.1992)); In re Morris, 12 B.R. 509, 511 (Bankr.Nev.1981).
Finally, "[f]or a debt to fall within this exception to discharge, the creditor has the burden of proving that it sustained an injury as a result of a willful and malicious act by the debtor. Thus, a debtor's actions must be determined to be the cause of the creditor's injury." In re Smith, 249 B.R. 748, 750 (Bankr.S.D.Ohio 2000) (emphasis in original); In re Best, 109 Fed.Appx. at 6; Steier v. Best, 287 B.R. 671, 674-75 (W.D.Ky.2002). "To demonstrate proximate cause, the plaintiff must show that the injury was a necessary product of the harmful act." In re Apte, 180 B.R. 223, 231 (9th Cir. BAP 1995); In re Goldbronn, 263 B.R. 347, 367 (Bankr.M.D.Fla.2001).
a. Fraud
CMEA asserts that Little made false representations material to the transaction, including the creation of false checks for the purpose of enhancing Reynolds' ability to obtain a loan, and the submission of a fraudulent land installment contract. Herein, CMEA has not met its burden of showing by a preponderance of the evidence that Little's conduct meets the requirements of § 523(a)(6) with regard to Conseco's loan to Reynolds. It is apparent that CMEA, an assignee of Citifinancial, suffered an injury based on the loan transaction with Reynolds.
CMEA argues that Little committed fraud, and that this fraud met the requirements of willfulness and maliciousness. Under Ohio law, "the elements of an action in actual fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a *385 resulting injury proximately caused by the reliance." Gaines v. Preterm-Cleveland, Inc., 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987). Although CMEA's trial brief is guided by the state law elements of fraud, the ultimate determination for this Court is whether Little engaged in willful and malicious conduct, as required by § 523(a)(6). In re Gulevsky, 362 F.3d 961, 963-64 (7th Cir.2004) (citations omitted) ("Fraud, of course, is an intentional tort and § 523(a)(6) makes many intentional torts nondischargeable. But § 523(a)(6) cannot make all debts procured by fraud nondischargeable, because that would make superfluous § 523(a)(2), § 523(a)(4), and § 523(a)(11), all of which make different sorts of debts procured by fraud nondischargeable.").
CMEA focuses on copies of twelve checks made payable from Albert Reynolds to Sheldon Little.[6] To show the fraudulent nature of these checks, CMEA offers the testimony of three witnesses. First, CMEA offers the testimony of Alvin Morillo, a representative of LorMet Community Credit Union, who testified that the account numbers on the checks did not correspond to an account in Reynolds' name, and that Reynolds had never had an account with his bank. Second, CMEA offers the testimony of Little, who testified that it was his signature that appeared on the endorsement of the checks. Third, CMEA offers testimony from Reynolds to show that he did not sign the checks.[7] CMEA also offers Little's testimony to demonstrate that Little knew about, and was involved in the loan to Reynolds. Little offers no testimony that would tend to contradict or dispute any of this testimony. He does, however, dispute the extent of his involvement in the loan transaction.
CMEA's evidence, however, establishes only that Little's signature appeared on copies of fraudulent checks. CMEA did not offer evidence to show that Little was involved in the creation of the checks, or that he knew that fraudulent checks bearing his signature would be submitted to Conseco for the purpose of improving Reynolds' ability to obtain a loan. Therefore, CMEA has not met its burden of showing that Little engaged in conduct that he knew, or should have known, would injure Conseco.
Further, even if Little had engaged in willful and malicious conduct in this instance, CMEA has not shown that Conseco's injury was the result of Little's conduct. This would require CMEA to show that Conseco did, in fact, rely upon the fraudulent information (the copied checks) when making the decision to grant Reynolds the loan. CMEA did not provide any evidence connecting the fraudulent checks to Conseco's decision to make a loan to Reynolds. There is no testimony, or other circumstantial evidence, to show what weight, if any, that Conseco gave to those checks when making its loan decision. Therefore, CMEA has not met its burden of proving that Little's alleged conduct was a cause of Conseco's decision to make the loan to Reynolds.
Finally, CMEA produced no evidence which would indicate that Little prepared or submitted a fraudulent land sale contract.
Accordingly, CMEA has not met its burden of proving that Little engaged in willful and malicious conduct which was the cause of Conseco's decision to give Reynolds a loan.
*386 b. Conversion
CMEA also asserts that by transferring the property to Ashraf, despite the fact that he had previously transferred the property to Reynolds, Little committed a conversion of the Real Estate. On this point, the Court finds that CMEA has shown by a preponderance of the evidence that Little engaged in willful and malicious behavior, causing injury to CMEA.
Initially, it is undisputed that CMEA suffered legal injury. In re Apte, 180 B.R. 223, 231 (9th Cir. BAP 1995) ("Many cases which arise under § 523(a)(6) concern the alleged conversion by the debtor of the plaintiff's property or the alleged conversion by the debtor of property subject to a security interest."); In re Posta, 866 F.2d 364, 367 (10th Cir. 1989) ("Such injury [under § 523(a)(6)] includes the conversion of property subject to a creditor's security interest."); In re Leslie-Hughes, 1990 WL 84503, * 3 (Bankr. W.D.Tenn.1990) ("[W]hen the Debtor sells secured collateral, the creditor's security interest  its protection against the Debtor's bankruptcy vanishes; and finding the debt as nondischargeable under § 523(a)(6) thus puts the creditor in the same position as he would have been but for the willful and malicious conversion."). Under Ohio law, "[a] mortgage is a security agreement that conveys a legal interest in real property contingent on the payment of an underlying debt." E.g., Apostolakos v. Panagouleas, 2002 WL 857655, * 2 (Ohio App.2002). In exchange for the loan of $95,000, Reynolds granted to Conseco a security interest in the Real Estate.[8] Reynolds has defaulted on the loan. The value of CMEA's non-perfected interest was reduced by virtue of the perfected interest of Washington Mutual in the amount of $65,000.
Conversion is the wrongful control or exercise of dominion over property belonging to another which is inconsistent with or in denial of the rights of the owner. Baltimore & Ohio Railroad Co. v. O'Donnell, 49 Ohio St. 489, 32 N.E. 476 (1892). Under Ohio law, "[i]n order to prove the tort of conversion, a plaintiff must demonstrate: (1) that the plaintiff owned or had a right to possess the subject property at the time of the alleged conversion; (2) that the defendant's alleged conversion was the result of a wrongful act or disposition of the plaintiff's property rights; and (3) that damage to the plaintiff occurred as a result of the alleged conversion." In re Williams, 233 B.R. 398, 402 (Bankr.N.D.Ohio 1999) (citing Tabar v. Charlie's Towing Service, Inc., 97 Ohio App.3d 423, 427-28, 646 N.E.2d 1132, 1136 (Ohio App.1994)). Further, "[a]ll that is required is that the tortfeasor intend to do the act which interferes or is inconsistent with the ownership rights of the true owner. The tortfeasor need not derive a benefit from the tortious act." Bank One, Cleveland, NA v. Ohio Convenient Food Mart, Inc., 1991 WL 163447, * 2 (Ohio App.1991) (citation omitted).
A finding that Little engaged in conversion, however, does not excuse CMEA of its burden of showing that Little's conduct was willful and malicious. E.g., Geiger, 523 U.S. at 64, 118 S.Ct. 974 (citing Davis v. Aetna Acceptance Co., 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934)) ("[N]ot every tort judgment for conversion is exempt from discharge."); In re Martin, 321 B.R. at 441 ("Thus, while they do appreciably overlap, liability for conversion does not automatically equate with the existence of a nondischargeable debt under § 523(a)(6)."); In re Jenkins, 330 B.R. 625, *387 630 n. 2 (Bankr.E.D.Tenn.2005) ("An act of conversion may constitute willful and malicious injury depending on whether or not the debtor intended to cause the harm or was substantially certain that such harm would occur.").
Where the debtor converts property subject to a security interest, "[u]nless the creditor can prove not only that the debtor knew of the security interest, but also that the debtor knew that a transfer of the property was wrongful and certain to cause financial harm to the creditor, the debt should not be found nondischargeable." In re Diel, 277 B.R. 778, 783 (Bankr.D.Kan.2002) (quoting 4 COLLIER'S ON BANKRUPTCY § 523.12[1] (15th Ed. Rev. 2001)); In re Rountree, 2002 WL 832669, * 7 n. 7 (Bankr.M.D. N.C.2002) ("A deliberate and intentional disposition of a creditor's collateral or proceeds that is known by the debtor to be unauthorized and contrary to the security agreement should satisfy this test, as well, since such a misuse or conversion is substantially certain to cause injury to the creditor or its security interest."). In this case, this requires that CMEA show, by a preponderance of the evidence, that Little knew, or should have known, that the transfer of the Real Estate to Ashraf would cause harm to Citifinancial.
CMEA has produced evidence to show that Little's transfer of the property to Ashraf constituted a conversion, and that the conversion was willful and malicious. It is not in question that the mortgage note granted Conseco (and by way of successorship to Citifinancial and CMEA) a security interest in the Real Estate. Little exercised dominion over the property by transferring the property to Ashraf. See, e.g., Charash v. Oberlin College, 14 F.3d 291, 297 (6th Cir.1994) (quoting PROSSER AND KEETON ON TORTS 106 (5th ed. 1984)) ("The conversion is complete when the defendant takes, detains, or disposes of the chattel."). Finally, CMEA suffered damages as a result of Little's transfer, since Washington Mutual obtained a lien on the property which is superior to the lien of CMEA.
CMEA has also offered evidence to show that Little's conduct was willful and malicious. Little was on notice of the security interest of Conseco. Little testified that he attended a meeting with Ivey and Conseco regarding the sale of the Real Estate to Reynolds, as well as assisting in the preparation of paperwork. Little offers no testimony, nor does he deny, that he was aware that Conseco owned a secured interest in the Real Estate. Further, Little, by receiving tax bills on the property, testified that he became aware that title had not passed, and that the house was still in his name. Therefore, Little knew, or should have known, that title was still in his name, despite the fact that Conseco believed that the Real Estate had been transferred to Reynolds.
Little is currently employed as a mortgage broker, and has personally been involved with ten to fifteen investments on prior occasions. As an investor and mortgage broker, Little knew, or should have known, that transferring the property to Ashraf would harm Conseco's secured interest. Little's assertion that he entered the second transaction merely to stop the delivery of erroneous tax bills is incredible.
Little knew that he had transferred the same property to Reynolds on March 25, 2002. Nonetheless, he executed another deed transferring the property to Ashraf on June 30, 2003. Ashraf testified that Little chose Washington Mutual, and prepared the paperwork for her signature. Little transferred the property to Ashraf, despite knowing that he had previously conveyed such property to Reynolds. *388 Further, Little's action in this regard occurred after learning of CMEA's failure to record the deed transferring the property to Reynolds. Thusly, it is quite clear that Little deliberately intended the results of his actions. CMEA has shown by a preponderance of the evidence that Little's conduct was both willful and malicious, and that he knew or should have known that his conduct would cause harm to Conseco. Subsequently, such conduct was harmful to CMEA.
Little seemingly rests his argument on the premise that CMEA's injury was caused by its own failure to record the mortgage. It is undisputed that CMEA could easily have prevented the injury by properly perfecting its security interest in the Real Estate. Although this failure was a cause in fact to its injury, this does not absolve the fact that Little's conduct was the proximate cause of the injury. "The Supreme Court of Ohio has stated that if an intentional tort was committed with malice, and if that intentional tort was the proximate cause of the plaintiff's damage, then the negligence of the plaintiff is not a defense." Doyle v. Fairfield Machine Co., Inc., 120 Ohio App.3d 192, 224, 697 N.E.2d 667, 688 (Ohio App.1997) (Ford, J. concurring) (citing Schellhouse v. Norfolk & W. Ry. Co., 61 Ohio St.3d 520, 524, 575 N.E.2d 453, 456 (1991)); Regal Cinemas, Inc. v. W & M Properties, 90 Fed.Appx. 824, 831 (6th Cir.2004) (citing Doyle).
The Eleventh Circuit faced a similar situation in the context of § 523(a)(2)(B). In re Collins, 946 F.2d 815, 816 (11th Cir.1991). In Collins a secured creditor was induced into making a loan to the debtor. The creditor subsequently failed to file UCC forms required for perfection of its secured collateral. Had the creditor perfected its interest, it would have been the superior lienholder. The Eleventh Circuit disagreed with the debtor's assertions that such failure, and not the debtor's misconduct, was the cause of the creditor's harm, holding that:
[a]lthough Palm Beach could have prevented its own injury by perfecting its interest in Collins's collateral property, the Bankruptcy Code does not require such diligence on the part of a creditor induced by fraudulent means in extending credit to a debtor. It is the honest debtor which Congress intended to protect through the Bankruptcy Code, especially when discharging a bankrupt's debts. "One of the primary purposes of the bankruptcy act is to `relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh.'"
Congress provided for nondischargeability in order that dishonest debtors would not benefit from their wrongdoing. "The debtor attempting to abuse the proceedings of bankruptcy is not entitled to the complete medley of Bankruptcy Code protections. The Bankruptcy Code thereby attempts to discourage such abuse." If Collins had not made false representations as to the status of his collateral property, Palm Beach would not have loaned Collins $150,000. Therefore, we find no error in the bankruptcy court's finding that Collins's false statements were the proximate cause of Palm Beach's harm.
In re Collins, 946 F.2d 815, 816-17 (11th Cir.1991) (citations omitted); In re Thompson, 316 B.R. 326, 328 (Bankr. W.D.Mo.2004) (applying the reasoning of Collins in the context of § 523(a)(6) to find that the willful and malicious conduct of the debtor was unforeseeable, and therefore the creditor's failure to perfect its security interest was not a proximate cause of harm); see also In re Lett, 238 B.R. 167, 188 (Bankr.W.D.Mo.1999) ("[T]he elements of intent, injury and *389 proximate cause are the same for §§ 523(a)(2) and (a)(6); the only difference is a matter of degree.").
This case presents a similar circumstance where a secured creditor may have been in a position to prevent its own injury. By focusing on CMEA's failure, Little chooses to ignore the fact that if he had not transferred the property to Ashraf, Citifinancial would have retained a secured interest in the property by virtue of its mortgage. If Little had not conveyed the property to Ashraf, Washington Mutual would not have acquired a superior secured interest. CMEA's failure to record the deed and mortgage did not grant Little a license to transfer the property a second time to Ashraf. As noted above, this conduct was willful and malicious. Little's conduct constituted a willful invasion of Citifincial's legal rights, which are now, by assignment, reposed on CMEA. Furthermore, Little's willful and malicious acts were the superseding cause of CMEA's injury.
Accordingly, the Court finds that Little engaged in willful and malicious conduct causing injury to CMEA, and pursuant to § 523(a)(6), his debt is nondischargeable.

* * * *
Accordingly, CMEA's Complaint to Determine Dischargeability is well-premised and judgment is hereby rendered in favor of CMEA. Little's debt to CMEA is determined to be nondischargeable. Each party is to bear its respective costs.
IT IS SO ORDERED.
NOTES
[1] See Agreement, Plaintiff's Exhibit 14-21.
[2] CMEA confirmed at trial that it did not wish to pursue claims under 11 U.S.C. § 523(a)(2), as indicated in its complaint.
[3] See Complaint in State Court Proceeding, Plaintiff's Exhibit 17 at ¶ 22.
[4] Id.
[5] Id.
[6] Plaintiff's Exhibit 2-1.
[7] Reynolds Deposition, at 26.
[8] Plaintiff's Exhibit 5.